Ellis CAMPBELL, Jr., District Director of Internal Revenue, Appellant,

v.

CARTER FOUNDATION PRODUCTION COMPANY, Appellee.

No. 18980.

United States Court of Appeals
Fifth Circuit.

Sept. 19, 1963.

John R. Brown and Wisdom, Circuit Judges, dissented in part.

---

Louis F. Oberdorfer, Asst. Atty. Gen., Lee A. Jackson, Atty., Dept. of Justice, Washington, D. C., Barefoot Sanders, U. S. Atty., W. E. Smith, Asst. U. S. Atty., Dallas, Tex., Michael I. Smith, Atty., Dept. of Justice, Washington, D. C., for appellant.

Harry C. Weeks, Fort Worth, Tex., for appellee.

Before BROWN, WISDOM and BELL, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

In this appeal by the Government from a judgment in favor of the Taxpayer corporation, we are confronted with two questions. The first is whether amounts paid by Taxpayer to its sole stockholder were "interest on indebtedness" entitling Taxpayer to a deduction rather than nondeductible constructive dividends as urged by the Government. The second is whether Taxpayer, as a result of the transfer of assets from the Foundation to its wholly owned Taxpayer operating corporation, gets a stepped-up basis for purposes of depreciation and depletion. As the parties present this, it revolves around the question whether installment notes given by Taxpayer to its sole stockholder in payment for certain assets constituted "stock" or "securities" so as to make the transaction tax-free. The first question we answer favorably to Taxpayer and accordingly affirm that portion of the judgment. As to the second, the Government is correct and we reverse that portion of the judgment.

Foundation [1] (not a party to these proceedings) was a non-profit Texas corporation without capital stock or stockholders, chartered in 1945 for the purpose of supporting religious, charitable and educational undertakings. The status of the Foundation as a tax exempt charitable organization is neither in, nor open to, question here. Foundation received from the late Amon G. Carter and his wife various oil and gas producing properties and other assets, including, in the form in which they then existed, the oil and

---

[1]. Amon G. Carter Foundation.

gas properties involved in this proceeding. With full knowledge that Foundation would operate said oil and gas properties, Foundation was classified as an organization exempt from Federal income tax under § 101(6) of the Internal Revenue Code of 1939 and a Closing Agreement was entered into between Foundation and the then Secretary of Treasury fixing this exempt status.

Until near the end of 1950, Foundation functioned in accordance with its original plan, deriving income from its oil and gas holdings and making therefrom, and from other sources, substantial contributions to educational, religious and charitable organizations, during all of which time the exempt status of Foundation was recognized by the Internal Revenue Service.

Late in 1950, Congress adopted legislation which levied a tax at corporate rates on the "unrelated business taxable income" of organizations such as Foundation.[2] Organizations such as Foundation were allowed to receive as non-taxable income interest, dividends and royalties as well as certain other types of income. But under the Amendments, a corporation such as this was subjected to a tax upon what may be termed income from ordinary business operations conducted by it. Thus, if Foundation continued to own and operate the various producing properties which it had acquired from its settlor-benefactors, the income from which for the four and one-half years since its organization it had, with the express approval of the Secretary of the Treasury, been permitted to receive without being subjected to corporate tax thereon, it would, after January 1, 1951, be subject to corporate tax upon this income. On the other hand, if its revenues from these properties were limited to interest and royalties, it would not be subject to tax thereon.

It was to meet this situation and to permit Foundation to continue to carry out fully the benevolent program envisaged and intended by its organizers that Taxpayer[3] came into being. Taxpayer was chartered under the laws of the State of Texas as an oil producing company on December 26, 1950, with an authorized capital stock of $100,000 fully subscribed and timely paid in cash. From that time and during all of the times involved in this proceeding, all of the outstanding capital stock of Taxpayer was owned by Foundation.

Immediately after its incorporation, Taxpayer purchased from Foundation various oil and gas properties and related depreciable equipment. The total consideration for the purchase of these assets was $2,440,859.10. Of this Taxpayer paid $50,000 in cash and for the balance issued eleven promissory notes in the aggregate amount of $2,390,859.10. The notes were due on or before January 1, 1956. Each note bore interest at the rate of 4% per annum and provided for monthly installments in the amount of $10,000, which payments were to be applied first to interest and then to principal. These notes were secured by vendor's liens. As to the Texas properties transferred, which constituted the major part of the transaction, this meant that Foundation retained a superior title. Foundation also retained overriding royalties on the leases transferred to Taxpayer.

Prior to the time these operating oil and gas interests were transferred to Taxpayer, they were appraised and valued by reputable, competent independent consulting engineers and geologists. Using this report as a basis, the depreciable equipment was assigned a certain portion of the total valuation and Taxpayer treated such assigned portions as its cost of the equipment. In most instances the valuation so assigned to depreciable equipment equaled the total amount of cash and notes given by Taxpayer to Foundation allocated to the par-

2. The pertinent provisions of this Act were incorporated into the Internal Revenue Code of 1939 as §§ 421–424, and were carried forward, without pertinent change, into §§ 511–515 of the Internal Revenue Code of 1954. 26 U.S.C.A. §§ 511–515.

Carter Foundation Production Company.

ticular property. As to two of the leasehold units, the value of the overriding royalty retained by Foundation was deducted. In these two instances no value was assigned on the books of Taxpayer to the oil and gas reserves so acquired. As to the other leasehold units the difference between the total consideration and the amount allocated to equipment was entered on the books of Taxpayer as the cost of depletable reserves.

As found by the Court below, from 1951 to 1955, Taxpayer paid to Foundation $623,351.18 in principal and $431,931.13 as interest.[4] When the notes matured on January 1, 1956, there was a balance due of $1,767,507.92.[5]

Late in 1955, Taxpayer and Foundation entered into an oral agreement extending the maturity date of the notes for five years. Taxpayer negotiated with a local Bank for a loan to pay off this outstanding indebtedness. However, Taxpayer did not consummate the loan and on October 1, 1956, Foundation cancelled the then unpaid balance due on the notes ($1,475,000) and contributed that amount to Taxpayer as paid-in surplus.

Taxpayer properly filed income and appropriate excess profits tax returns for the calendar years 1951 through 1955 on the cash receipt and disbursement basis of accounting.[6] In computing its income for these years, Taxpayer deducted from gross income the amounts it had paid to Foundation as interest on the notes. Taxpayer also claimed depletion and depreciation deductions based on the cost it had assigned to the depletable and depreciable property it had bought from Foundation.

The Commissioner asserted deficiencies as to all of the returns. The deductions taken for interest on the notes was disallowed in computing taxable income. The deductions for depreciation claimed by Taxpayer were reduced so as to use as the basis for depreciation the adjusted basis for depreciation which these assets had in the hands of Foundation at the close of the year 1950. As to the properties on which Taxpayer had calculated its allowance for depletion upon its assigned cost, the Commissioner calculated the depletion allowances upon the percentage of income basis.

After payment of the deficiencies, claims for refund and rejection, Taxpayer timely filed this suit for refunds with interest. Trial was had to the Court sitting without a jury and judgment was entered for Taxpayer on both issues for the full amount claimed. It is from this judgment that the Government has appealed.

It was stipulated that the depreciable equipment acquired by Taxpayer from Foundation had the fair market value ascribed to it by Taxpayer, and that, if it was entitled to use its costs for depletion and depreciation purposes, the amounts deducted by it in its tax returns for depletion and depreciation were correctly calculated and deducted.

## I.

The Government contends here, as it did below, that Taxpayer was a "thin corporation," and the indebtedness not bona fide so that amounts which it paid to Foundation as interest are to be treated as dividends not deductible by Taxpayer. In this respect the Court below found that "there was in fact here no thin capitalization. At all times [Taxpayer] had sufficient operating capital to pay for its operations and make the profit that it did make here. At all times, the ratio was on the side of assets of the corporation and not the liabilities * *. [Taxpayer] is a bona fide corporation, and was at all pertinent times involved

4.

| Year | Interest | Principal |
|------|----------|-----------|
| 1951 | $85,811.05 | $ 30,505.75 |
| 1952 | 91,520.24 | 178,479.76 |
| 1953 | 97,935.12 | 131,859.39 |
| 1954 | 82,303.96 | 136,867.04 |
| 1955 | 74,360.76 | 145,639.24 |

5. Additional payments were made in 1956.

| | Interest | Principal |
|------|----------|-----------|
| 1956 | $49,652.82 | $249,022.40 |

6. The year 1951 is not here in issue.

in this proceeding. It was the bona fide and actual owner of the properties and actual interests conveyed to it by [Foundation] * * *." Not only were these findings not clearly erroneous, F.R.Civ.P. 52, but in our opinion it would be difficult to more accurately state the status of Taxpayer in this respect.

The Government contends that the notes were not a bona fide indebtedness because Taxpayer was really under no obligation to pay them off. The Government couples this assertion with the fact that Foundation was the sole stockholder of Taxpayer to support its conclusion that the amounts paid on the notes as interest were dividends in reality. We cannot align ourselves with this theory.

██ Both the 1939 Code and the 1954 Code provide that there shall be allowed as a deduction all interest on indebtedness which is paid or has accrued within the taxable year.[7] In the many years since this provision first appeared in the taxing statutes, Congress has not sought to qualify this basic command that interest is deductible by forbidding its application to situations involving parent-subsidiary corporations. We have no doubt about the basic proposition that an individual or corporation can occupy the dual position of stockholder and creditor even though such stockholder-creditor owns a mere fraction or all of the debtor corporation's stock. Farley Realty Corp. v. Commissioner, 2 Cir., 1960, 279 F.2d 701; 4 Mertens, Federal Income Taxation § 26.06 (1960). And transactions between parent-subsidiary corporations are not to be disregarded for tax purposes merely because of that relationship. By the same token, a transaction should not be disregarded merely because it occurred in response to a change in the governing tax law.

Kraft Foods Co. v. Commissioner, 2 Cir., 1956, 232 F.2d 118.

██ The Code requires three things before interest can be deducted. (1) There must be an indebtedness. (2) There must be interest on it. (3) What is claimed as an interest deduction must have been paid or accrued within the tax year. 4 Mertens, Federal Income Taxation § 26.01, p. 3 (1960). There is no doubt that (3) has been satisfied here. Taxpayer actually made interest payments to Foundation during the years in question. As to (1), this same authority says that " 'indebtedness' as used in the Code implies an existing unconditional and legally enforceable obligation to pay." Id. § 26.04, p. 16. As to (2), "interest" is given its ordinary meaning. For tax purposes as well as "In the business world 'interest on indebtedness' means compensation for the use or forbearance of money" or the "amount which one has contracted to pay for the use of borrowed money." Deputy v. Du Pont, 1940, 308 U.S. 488, 497–498, 60 S.Ct. 363, 368, 84 L.Ed. 416. This is best evidenced by looking to the notes which clearly show an intent on the part of Taxpayer to pay to Foundation an amount over and above the principal payments at a specified rate. More than that, intent is very much a fact on which the Court made findings which come here with the buckler and shield of F.R.Civ.P. 52(a).

In reaching our decision that the notes represented actual genuine indebtedness upon which there was interest due, we have kept in mind these many factors. Both Taxpayer and Foundation were separate bona fide entities. The transactions under scrutiny were brought about by the good faith efforts of Foundation to maintain its income free and clear so

7. Internal Revenue Code of 1939:
   "§ 23. Deductions from gross income.
   "In computing net income there shall be allowed as deductions:
   *   *   *   *   *
   "(b) Interest. All interest paid or accrued within the taxable year on indebtedness * * *."

Internal Revenue Code of 1954:
   "§ 163. Interest.
   "(a) General rule.—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness. * * *." (26 U.S.C.A. § 163).

that it could continue its many benevolent activities. A business need arose because of change in tax laws. Foundation's claim as creditor was never subrogated nor was there a waiver or modification of its prior liens on the property transferred. Taxpayer was not under-capitalized. It had $100,000 in paid-in capital. Throughout the years in question, Taxpayer maintained daily bank balances in excess of $225,000. The notes could have been paid on their original maturity date by "outside" financing which would have been commercially attractive. The consideration for the notes (property transferred from Foundation to Taxpayer) was entirely adequate. The trial Judge found, based on evidence which he was entitled to credit and which we have no basis to reject, that Foundation accepted the notes intending to collect them and Taxpayer gave the notes intending to pay them. The amount of the notes was gradually, but consistently, reduced and the ratio of debt to value of the property continually enhanced. The fact that years later the notes were ultimately cancelled and the outstanding amount thereof contributed to Taxpayer's paid-in surplus while a factor, is certainly not enough to compel the trier to disregard all of the other indicia of a real debt for both principal and interest.

█ Little more need be said about this phase of the case. Both Taxpayer and the Government rely on the language of several of the same cases, e. g., Rowan v. United States, 5 Cir., 1955, 219 F.2d 51; Sun Properties, Inc. v. United States, 5 Cir., 1955, 220 F.2d 171; Farley Realty Corp. v. Commissioner, 2 Cir., 1960, 279 F.2d 701, and there are many cases holding both pro and con on this issue, e. g., United States v. Title Guarantee & Trust Co., 6 Cir., 1943, 133 F.2d 990; Gooding Amusement Co. v. Commissioner, 6 Cir., 1956, 236 F.2d 159; Kraft Foods Co. v. Commissioner, 2 Cir., 1956, 232 F.2d 118, some of which have attempted to set down guidelines for the future, e. g., Brake & Electric Sales Corp. v. United States, D.C.Mass., 1960, 185 F.Supp. 1, aff'd, 1 Cir., 1961, 287 F.2d 426. It would serve no useful purpose for us to distinguish the cases relied on by the Government or to determine whether in the light of our holdings we would accept them as authoritative. But we hold that under the circumstances of this record, a bona fide indebtedness existed and Taxpayer is entitled to deduct the interest it actually paid to Foundation.

## II.

We come now to the question of whether the stepped-up basis can be sustained. At least in a formal way this turns on the question whether these notes were to be classified as "stock" or "securities" within the purview of § 112(b) (5) of the 1939 Code [8] which provides in material part that no gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or security in such corporation. Section 113(a) of the 1939 Code [9] provides that as a gen-

8. Internal Revenue Code of 1939.
"§ 112. Recognition of gain or loss—
"(a) General rule. Upon the sale or exchange of property the entire amount of the gain or loss, determined under section 111, shall be recognized, except as hereinafter provided in this section.
"(b) Exchanges solely in kind—
* * * * *
"(5) Transfer to corporation controlled by transferor. No gain or loss shall be recognized if property is transferred to a corporation by one or more persons solely in exchange for stock or securities in such corporation, and immediately after the exchange such person or persons are in control of the corporation; * * *."

9. Internal Revenue Code of 1939.
"§ 113. Adjusted basis for determining gain or loss—
"(a) Basis (unadjusted) of property. The basis of property shall be the cost of such property; except that—
* * * * *
"(8) Property acquired by issuance of stock or as paid-in surplus. If the property was acquired after December 31, 1920, by a corporation—
"(A) by the issuance of its stock or securities in connection with a transaction described in section 112(b) (5) (including, also, cases where part of the consideration for the transfer of such property to the corporation was property or

eral rule the basis of property for the purpose of determining gain or loss—and under § 114(a), (b) [10] for the purpose also of computing depreciation and depletion allowances—shall be the "cost" of such property. The exception pertinent here is contained in § 113(a) (8) [11] which provides that where property is acquired by a corporation in an exchange governed by § 112(b) (5), or as paid-in surplus or as a contribution to capital, the basis of the property shall be the same as it would be in the hands of the transferor. These provisions remain basically unchanged in the 1954 Code.[12] Thus if these notes were "stock" or "securities" Taxpayer must use Foundation's basis for depletion and depreciation, rather than the actual purchase price and fair market value of the depreciable and depletable assets.

■ While it may appear to pose some conceptual difficulties, tax law is hardly a complete symmetry. Consequently, the decision under Part I that the notes represent a genuine indebtedness does not automatically solve the problem of basis. So-called bona fides is not decisive. The question still remains whether businessmen acting with all honor and sincerity have, or have not, set up a transaction which tax law regards as "stock" or "securities." It therefore remains our lot to determine the correctness of the Court's holding that these notes were not "stock" or "securities" within the meaning of the applicable sections of the Code.

Both parties rely strongly on Camp Wolters Enterprises, Inc. v. Commissioner, 5 Cir., 1956, 230 F.2d 555, and Aqualane Shores, Inc. v. Commissioner, 5 Cir., 1959, 269 F.2d 116. Taxpayer also places emphasis on Sun Properties, Inc. v. United States, 5 Cir., 1955, 220 F.2d 171. In Aqualane Shores, a corporation was organized by a father and two sons, each of whom contributed $3,200 for its capital stock. They then conveyed to the corporation substantially all of the land which they had acquired a few months earlier as a partnership which had a cost to them of $69,000 for a total consideration of $250,000, a major part of which was to be paid for by the corporation's execution of five annual installment notes. The land was for the most part mangrove swamp which had to be dredged in order to make it marketable. The corporation gave mortgages as security for money it borrowed to develop the swamp. The tax question presented was the basis of the land. We held that the corporation held the land on the same basis as its transferors, strongly emphasizing such factors as: the corporation only had $600 of operating funds; it could only pay off the notes if and when it sold land; and almost no payments of interest or principal were made.

money, in addition to such stock or securities), or

"(B) as paid-in surplus or as a contribution to capital, then the basis shall be the same as it would be in the hands of the transferor, increased in the amount of gain or decreased in the amount of loss recognized to the transferor upon such transfer under the law applicable to the year in which the transfer was made.

\* \* \* \* \*

"(b) Adjusted Basis. The adjusted basis for determining the gain or loss from the sale or other disposition of property, whenever acquired, shall be the basis determined under subsection (a) \* \* \*."

10. Internal Revenue Code of 1939.

"§ 114. Basis for depreciation and depletion

"(a) Basis for depreciation. The basis upon which exhaustion, wear and tear, and obsolescence are to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property.

"(b) Basis for depletion

"(1) General rule. The basis upon which depletion is to be allowed in respect of any property shall be the adjusted basis provided in section 113(b) for the purpose of determining the gain upon the sale or other disposition of such property \* \* \*."

11. See note 9, supra.

12. 26 U.S.C.A. §§ 167, 351, 611, 612, 1011, 1012.

The Camp Wolters case involved capital assets which were purchased, substantially contemporaneously with its formation, by the corporate taxpayer from its stockholders at a cost greater than the stockholders' basis. In turn, the stockholders received notes, payable within five to nine years, for the balance of the purchase price after a cash down payment. Immediately after their issuance, and according to a pre-existing plan, these notes were subrogated to a large bank loan, so that the payment of the notes was entirely dependent on the taxpayer's ability to market profitably the lands and buildings which it had acquired, and no payment could have been made on the notes until the large bank loan was entirely discharged. In that case, we affirmed the Tax Court's determination that these notes were "securities" within the meaning of § 112(b) (5) of the 1939 Code.

In Sun Properties we dealt with the basis which that company had in a warehouse property it acquired from its sole stockholder. The entire paid-in capital of this corporation was something less than $500. A few days after its organization, its sole stockholder transferred to it a warehouse building and the land upon which it was located for $125,000 to be paid at the rate of $4,000 each six months, with no interest being provided for, and with no purchase-money lien retained. At the time of this sale the warehouse was under a very favorable lease, from which in the first year of ownership the corporation derived net profit of $21,000. The Commissioner disallowed depreciation based on the purchase price of the warehouse. This was sustained by the District Court. We reversed in an opinion holding that the transfer of the warehouse to the taxpayer was not a contribution to capital (which would require the use of the same basis as in the hands of the transferor) but was a bona fide sale entitling the corporate taxpayer to use its cost for depreciation purposes.

Although not directly in point, our recent case of United States v. General Geophysical Co., 5 Cir., 1961, 296 F.2d 86, may be added to this list. In that case, several stockholders of a closely owned corporation decided to retire their stock. To accomplish this, the stockholders transferred their stock to the corporation in return for which they received cash and corporate properties equal to the fair market value of the stock. A few hours later the corporation purchased this same property from the stockholders issuing notes secured by mortgages. The cost of the property when re-acquired by the corporation was greater than the basis the property originally had in the hands of the corporation since it then reflected fair market value. There we refused to allow the corporation a stepped-up basis for depreciation purposes. In doing so we said, "that *for tax purposes* there was not a sufficient severance of the corporation's ownership over the assets for the transaction to create the tax consequence that when the corporation reacquired the assets it took them with a stepped-up basis." 296 F.2d 86, 90.

■ A majority of the Court concludes that the approach of General Geophysical compels a reversal as to this Part II.[13] Although the facts of that case are distinguishable from the present case, the underlying principles to be applied are much the same. We emphasized there, as we emphasize here, that our decision is not based on lack of good faith between the parties. Nor do we in any manner question the integrity of the parties, or doubt the validity of the business purposes involved in the transaction. We also think that no purpose would be served in trying to recast the principles which are to be distilled from our prior decisions in Sun Properties, Rowan, Wolters, and Aqualane.

13. As to Part II Judge BROWN dissents on the ground that on the undisputed evidence and fact findings below the transaction meets all of the tests of our prior cases to make the promissory notes just that and not "stock" or other "securities."

From the viewpoint of tax consequence, one factor seems to stand out. The Foundation owned the properties. It received the full economic benefit of such ownership which enabled it to carry out the beneficent objectives the Carters had in mind. Along came a marked change in the income tax law. The problem was how best to achieve under the new tax law the position it had under the former law. The solution broadly stated was to cut up the properties into two parts, (1) those resembling operating interests and (2) those called or resembling royalties. But in the final analysis economic ownership would remain the same since the Foundation would own the (a) reserved royalties and (b) through stock ownership in the corporation the operating interests. The corporation was not set up to accomplish anything else. Much as in Wolters the corporate structure was an integral part of the plan. This proves, of course, that there was a genuine business need which was served —the business of preserving as much as possible for charitable disbursement. And it does not detract from that need or the legitimate method employed to achieve it that the need arose wholly from revision in the tax laws. But casting the transaction in that form did not really rearrange beneficial ownership. It was more nearly contribution of properties to the corporation, so that the promissory notes representing the consideration therefor were the substantial equivalent of equity securities, no matter what their legal (or tax) status for other purposes might be.

The result is that the case is affirmed as to Part I but reversed and remanded for further consistent proceedings as to Part II.

Affirmed in part.

Reversed and remanded in part.

WISDOM, Circuit Judge (concurring in part and dissenting in part).

I respectfully dissent from Section I of the Court's opinion. As I see it, the amounts paid as "interest" were in fact dividends. The transfer of property from the Foundation to the taxpayer in exchange for so-called "promissory notes" was nothing more than a contribution to the taxpayer's capital. I cannot see a debtor-creditor relationship within the meaning of Section 23(b) of the Code of 1939 and Section 163(a) of the Code of 1954.