**WOOLLEY EQUIPMENT COMPANY and Woolley Fishing Tool, Inc., Plaintiffs,**

v.

**UNITED STATES of America, Defendant.**

Civ. A. No. 4421.

United States District Court
E. D. Texas,
Tyler Division.
Aug. 23, 1966.

Allen E. Pye, J. Robert Dobbs, Jr., Tyler, Tex., for plaintiffs.

Wm. Wayne Justice, U.S. Atty., Tyler, Tex., O. Jan Tyler, Dept. of Justice, Fort Worth, Tex., for defendant.

## OPINION

SHEEHY, District Judge.

This suit involves the Plaintiffs' claim for refund of federal income taxes and interest in the amount of $14,453.74, alleged to have been overpaid by the two Plaintiff corporations for their fiscal years ending September 30, 1963. The material facts established by the stipulations, and as found from the testimony and documents introduced at the trial of this cause, are as follows.

During the taxable year involved in this suit, the Plaintiffs were corporations duly organized under the laws of the State of Texas, with their principal offices in Kilgore, Texas. The Plaintiff Woolley Equipment Company and the Plaintiff Woolley Fishing Tool, Inc. each timely filed a separate corporation income tax return for its fiscal year ending September 30, 1963, and paid the income tax shown to be due thereon. Upon examination of the Plaintiffs' tax returns, the Commissioner of Internal Revenue disallowed deductions which the Plaintiffs had made regarding certain depreciation and interest items, and deficiency assessments were made accordingly. On or about October 31, 1964, the Plaintiff Woolley Equipment Company paid the alleged deficiency assessed against it in the amount of $10,030.75, plus interest in the amount of $514.73. On the same date, Plaintiff Woolley Fishing Tool, Inc. paid the alleged deficiency in income tax assessed against it in the amount of $3,717.50, plus in-

terest in the amount of $190.76. On January 12, 1965, each of the Plaintiff corporations timely filed a claim for refund of said income taxes and interest assessed and collected. On April 19, 1965, each of the Plaintiff corporations was notified by certified mail that its claim for refund had been denied by the Commissioner. Thereafter, on May 14, 1965, this action was brought by the Plaintiff corporations to recover the amount of taxes and interest which they allege were erroneously and illegally assessed and collected for their fiscal years ending September 30, 1963.

The factual background in this case is complex and complicated and cannot be very briefly capsulated. Prior to 1962, B. J. Woolley had been engaged in the business of renting various types of oil field tools and equipment and had conducted his business in the form of a sole proprietorship. In the early part of 1962, Mr. Woolley, prompted by his feelings that the high risk nature of his business necessitated protecting himself with a liability shield, decided to convert his mode of business operations to the corporate form. The first of four corporations, Woolley Rental Tool, Inc. (hereinafter "Rental Tool"), was incorporated in February of 1962. Mr. Woolley capitalized this company with $40,000.00 in cash, which the company in turn used to purchase from Mr. Woolley some of the equipment it would need to conduct its business operations. Beginning in July, 1962, Rental Tool entered into the various contracts and undertook to carry out the obligation of those contracts, and rented the various specialized tools needed from Mr. Woolley who continued to own the bulk of such equipment in his individual capacity.

Shortly after the incorporation of Rental Tool, Mr. Woolley realized that one corporation did not fully satisfy his business needs. In addition to his liability shield problem, another problem confronting Mr. Woolley was that of raising additional working capital for his overall operations. It was apparent from his experience that he could get no material assistance from banks and other lending institutions so long as the bulk of his assets continued to be represented on his financial statements at their depreciated book value rather than at their actual fair market value, which was much greater. Furthermore, Mr. Woolley desired to arrange his operation in such a way as to make it attractive to prospective investors, so as to increase the opportunity of bringing in outside capital. In addition, he wanted to be in a position to allow certain key employees to acquire a proprietary interest in the business and thereby hopefully insure their continued loyalty. Mr. Woolley also had given some consideration to the estate consequences of his actions, in that he desired to insure that in case of his death the business would not be in danger of being liquidated and that there would be a corporate structure in existence which would provide a firm basis for continued operations of the business. Finally, it was Mr. Woolley's desire to accomplish these goals in a manner which would produce the most favorable tax results.

After consulting with his accountants and attorneys, a corporate set-up was finally devised encompassing four corporations. Rental tool would continue to be the operating company, entering into and carrying out the various contracts. Woolley Equipment Company (hereinafter "Equipment Co.") would be organized for the purpose of owning the oil field equipment and would in turn rent it to the operating corporation, Rental Tool. A third corporation, Woolley Fishing Tool, Inc. (hereinafter "Fishing Tool") would be established to hold title to the specialized devices known as fishing tools, which are used to retrieve objects dropped into wells being drilled, and would likewise rent the equipment to the operating company, Rental Tool. Finally, Woolley Tool, Inc. (hereinafter "Tool, Inc.") would be established as a non-operating parent corporation, being the sole owner of the capital stock of the other three subsidiary corporations, and would provide management and adminis-

trative services for each of the three operating subsidiaries. It was intended that the stock in Tool, Inc., the parent corporation, would be owned by Mr. Woolley, members of his family, and certain business associates, and, in addition, it was anticipated that some shares would be sold to outside investors for the purpose of raising additional working capital.

After deciding on this corporate structure, Mr. Woolley consulted with his professional advisers as to the most advantageous method of achieving this result. A plan for achieving the desired result was devised and consummated in a series of steps which took place on February 27, February 28, and March 1, 1963. Each of the transactions comprising the overall result was planned in advance and all documents necessary to consummation were prepared in advance. The various steps which took place were as follows:

### 1.

a. On February 27, 1963, Mr. Woolley transferred individually owned depreciable assets, together with certain other assets, to Tool, Inc. in exchange for stock and the assumption by the corporation of certain liabilities. The depreciable assets had a fair market value on that date of $359,801.25, and an adjusted basis of $110,221.64. Mr. Woolley received from Tool, Inc. 7,143 shares of its Class A stock and 17,870 shares of its Class B stock, which at that time represented the entire amount of outstanding stock of Tool, Inc.

b. On February 27, 1963, Mr. Woolley transferred individually owned depreciable assets, together with certain other assets, to Equipment Co. solely in exchange for 25,591 shares of stock and the assumption by the corporation of certain liabilities. The depreciable assets had a market value on that date of $278,607.83, and an adjusted basis of $82,952.25. The stock received by Mr. Woolley was the full amount of the outstanding stock of the corporation.

c. On February 27, 1963, Mr. Woolley transferred individually owned depreciable assets, together with certain other assets, to Fishing Tool, solely in exchange for stock and the assumption by the corporation of certain liabilities. The depreciable assets transferred to Fishing Tool had a fair market value of $73,406.13, and an adjusted basis of $9,330.00. Mr. Woolley received 8,290 shares of stock, which was the total amount of outstanding stock in Fishing Tool.

### 2.

a. On Thursday, February 28, 1963, Tool, Inc. conveyed certain of the depreciable assets which it had received in the transfer from Mr. Woolley on the previous day, to Equipment Co. in exchange for an installment note in the amount of $279,932.33, bearing interest at the rate of 4% per annum, which was secured by a chattel mortgage on the assets so conveyed. These assets had a fair market value at the time of the transfer of $279,932.33, and an adjusted basis in the hands of Mr. Woolley, or Tool, Inc., of $165,929.28.

b. On February 28, 1963, Tool, Inc. conveyed certain other depreciable assets which it had received in the transfer from Mr. Woolley on the previous day to Fishing Tool in exchange for an installment note in the amount of $79,868.92, bearing interest at the rate of 4% per annum, which was secured by a chattel mortgage on the assets so conveyed. These assets had a fair market value on the date of the transfer of $79,868.92, and an adjusted basis of $18,786.10.

### 3.

a. On March 1, 1963, B. J. Woolley transferred to Tool, Inc. all of the stock which he owned in the three

corporations, Equipment Co., Fishing Tool, and Rental Tool, in exchange for 28,809 shares of Class B stock of Tool, Inc.

b. On March 1, 1963, Danny Woolley, the son of B. J. Woolley, transferred all of the stock which he owned in Rental Tool to Tool, Inc., in exchange for 2,419 shares of Class A stock in Tool, Inc.

c. On March 1, 1963, Marcus L. Johnson, an employee of B. J. Woolley, transferred to Tool, Inc. all of the stock which he owned in Rental Tool solely in exchange for 115 shares of Class A stock in Tool, Inc.

After the transfers on February 27, 1963, B. J. Woolley, individually, owned no fishing tools or oil field rental tools of any kind. After the transfers on March 1, 1963, Tool, Inc., therefore, owned all of the outstanding stock in Equipment Co., Fishing Tool, and Rental Tool. In addition, after the transfers of March 1, 1963, all of the outstanding stock of Tool, Inc. was owned by B. J. Woolley, Danny Woolley and Marcus L. Johnson.

The primary concern in this case arises from that part of the transaction described in step 2. above. In computing the taxable income for the year in question, each of the Plaintiff corporations claimed depreciation deductions based on its costs, i. e. the purchase price of the depreciable assets which it had purchased from Tool, Inc., the parent corporation. In addition, the Plaintiff corporations deducted from their gross income the amounts they paid during the fiscal year in question as interest on certain notes given by the Plaintiffs to Tool, Inc. as the purchase price for said depreciable assets. Upon examination of the Plaintiffs' tax returns, the Commissioner took the position that although the transfer of the equipment in question to the Plaintiffs was cast in the form of an installment sale, it did not give rise to a bona fide debtor-creditor relationship, but rather in substance and for tax purposes constituted a capital contribution. Therefore, the Commissioner determined

that the basis of these assets in the hands of the taxpayers for tax depreciation purposes should be the same as the basis of such assets in the hands of the transferor, that is, Tool, Inc. The Commissioner further determined that the notes issued by the Plaintiffs in exchange for the assets constituted "stock or securities" within the meaning of the income tax law, and the interest paid thereon was not deductible. Based on this determination, the Commissioner disallowed the deduction for payments made on the notes as interest and recalculated the allowable depreciation, using as a basis for the recalculation the basis that such assets had in the hands of Tool, Inc.

Specifically, there are two essential issues presented for determination by this state of facts, namely:

(1) What, under the facts, is the proper basis for computing depreciation on the assets acquired by the transfer from Tool, Inc.?

(2) Whether, under the facts, the Plaintiffs are entitled to a deduction for the amounts paid during the tax year as interest on the installment notes given by the Plaintiffs to Tool, Inc. as the purchase price of said depreciable assets?

The controlling factor for both of these issues lies in the determination of the character or nature of the transfer from Tool, Inc. to the Plaintiff corporations. The critical question is whether these transfers constituted bona fide "sales", as contended by the Plaintiffs, or whether they were contributions to capital, or equity contributions under Sec. 351 of the Internal Revenue Code of 1954, as asserted by the Defendant. The Court finds and concludes that the transactions in question were intended to be and were sales, both in form and in substance, for the reasons hereinafter stated.

 There is no doubt about the basic proposition that an individual can occupy the dual position of shareholder

and creditor. "[T]ransactions between parent-subsidiary corporations are not to be disregarded merely because of that relationship." Campbell v. Carter Foundation Production Company, 322 F.2d 827, 831 (5 Cir. 1963). Thus, the principle that under proper circumstances a transfer of assets on credit from one member of a corporate family to another may be fully recognized as a valid, bona fide sale between the corporations cannot be challenged. The difficulty in these cases lies in determining whether the facts establish a true debtor-creditor relationship as opposed to a shareholder's or a parent corporation's contribution to the capital of its subsidiary. 4 Merten's, Federal Income Taxation, Sec. 26.06 (1960 rev.).

■ It is well established that the intent of the parties is of primary importance in resolving questions of this nature, and that this intent is to be ascertained from all of the relevant facts and circumstances. Sun Properties, Inc. v. United States, 220 F.2d 171 (5 Cir. 1955) and Rowan v. United States, 219 F.2d 51 (5 Cir. 1955). Since B. J. Woolley was the sole stockholder in all the corporations involved at the time of the transactions, for all practical purposes "intent of the parties", therefore, means Mr. Woolley's intent. The testimony of Mr. Woolley was unequivocal that it was his intention that the transactions between his wholly owned corporations, Tool, Inc. on one hand and Fishing Tool and Equipment Company on the other, were to be sales and not capital contributions. This testimony is substantially supported and corroborated by evidence of the form of the transactions and, in addition, by the existence of several legitimate business purposes which necessitated that these transactions be in the nature of a sale rather than a capital contribution.

■ The form in which the transactions were cast is not in itself conclusive, but it is evidence of intent of the parties. Crawford Drug Stores v. United States, 220 F.2d 292, 295 (10 Cir. 1955). In the instant case, the forms of the transactions were clearly and undisputably that of sales. The conveyance instruments themselves were ordinary bills of sale. The installment notes issued as the purchase price for the assets in question were of the type customarily found in arms-length transactions. They contained unconditional promises to pay the interest and principal installments on designated dates and contained a fixed maturity date. The interest called for is reasonable and proper, and all payments of both principal and interest have been made in full up to the present. Tool, Inc., the parent corporation and the creditor, has the normal right to enforce the contract by declaring the entire balance due in the event the Plaintiffs should default in the payment of an installment. Furthermore, the notes are secured by chattel mortgages on the assets involved in the transactions. In addition, the transactions in question were reported on the books, the corporate minutes, and tax returns of the Plaintiffs as well as Tool, Inc., as sales. Thus, there is nothing in the form and the manner in which these transactions were carried out which would indicate that the transactions were anything other than bona fide sales of the depreciable assets in question from Tool, Inc. to the Plaintiff corporations.

■ The presence of substantial non-tax business reasons that the transaction be in the nature of a sale rather than a capital contribution confirms that the conveyances were sales in substance as well as in form. Truck Terminals, Inc. v. Commissioner, 314 F.2d 449, 453 (9 Cir. 1963). As discussed above, it was essential to fulfill the purposes of the corporate organization in question here that the value of the corporate assets be increased on the corporation books so as to more closely reflect their true market value, and thereby increase the borrowing capacity of the business organization. Furthermore, it was essential to Mr. Woolley's plan that there be a guaranteed cash flow, not dependent on profits in the Plaintiff corporations, from which Tool, Inc., the investment vehicle,

could pay dividends, the result of which was calculated to be attractive to potential outside investors in Tool, Inc. It was necessary that there be a sale rather than a capital contribution in order to accomplish these stated purposes.

Furthermore, the evidence establishes that these purposes have been fulfilled to a large extent. The credit squeeze which Mr. Woolley had been experiencing in his business operations has been greatly reduced. The various members of the corporate family have received numerous loans during the course of their business operations since the organization of the present corporate structure in 1963. Also, the lending institution which is the prime source of credit for Woolley's business operations has consented to retaining a $100,000.00 loan limit for the Woolley corporations, whereas prior to the organization of the business in the present corporate structure this institution was threatening to reduce Mr. Woolley's loan limit by $50,-000.00. In addition, some $40,000.00 worth of stock in Tool, Inc. has been sold to outside investors. Furthermore, whereas prior to the organization in 1963 there were only three persons who had an equity in the business, there are now no less than ten persons who own an interest in the business as shareholders in Tool, Inc., five of whom are non-participants, that is, persons other than officers, employees or members of their families.

██ It is well to note at this point that the fact that the taxpayers or that Mr. Woolley intended to minimize taxes by making a sale of a portion of his assets to the Plaintiff corporations rather than distributing the same assets as contributions to capital is not significant evidence in determining the crucial intent in this case. Furthermore, the fact that parties might enter into a transaction for the purpose of minimizing or avoiding taxes which might otherwise accrue does not of itself make a transaction something different from what it purports to be. Sun Properties v. United

States, supra, at 174. In fact, tax considerations have become so important today that tax avoidance *alone* may well constitute a legitimate business purpose for transacting business in a particular manner. Nevertheless, it is clear that the fact that a sales transaction had a beneficial tax result will not alter the nature of the transaction or imply that it was not what it purports to be. In Gregory v. Helvering, 293 U.S. 465, 55 S.Ct. 266, 79 L.Ed. 596 (1935), the Supreme Court held in effect that the purpose of tax avoidance is immaterial in matters of this sort, but that the genuineness of the transaction is very material, and states that the reorganization must be real and not a mere device which puts on the form of a corporate reorganization as a disguise for concealing its real character. Thus, while the cases impose a duty upon the Court to give close scrutiny to any transaction which has as its purpose a substantial tax benefit, the inquiry is only whether the transaction is what it purports to be and the tax advantage factor has no effect one way or another on the outcome of its determination.

██ In addition to the positive factors heretofore discussed which indicate that the transactions in question were bona fide sales, the Court also takes note of the fact that there is no evidence in this record which would tend to prove that the transactions were contributions to capital. The factors which the courts in considering similar problems to the one at hand have cited as being indicative that a transaction involved a capital contribution can be enumerated as follows: the acquiring corporation is usually undercapitalized; the assets involved in the transfer are usually absolutely essential to the operation of the business of the new corporation; the debts evidenced by the purchase notes are ordinarily subordinated to other debts of the purchaser, or otherwise indicating something other than normal arms-length creditor safeguards; payments on the principal are insignificant or are not made at all, and no effort is made by the

transferor to compel payment; the maturity date for the notes is inordinately postponed, or the "interest" is to be paid out of earnings only. See Rowan v. United States, supra; Sun Properties v. United States, supra; Aqualane Shores, Inc. v. Commissioner, 269 F.2d 116 (5 Cir. 1959); Campbell v. Carter Foundation Production Company, supra; Parkland Place Company v. United States, 354 F.2d 916 (5 Cir. 1966), affirming per curiam, 248 F.Supp. 974 (N.D.Tex.1964). Without reiterating with specific reference to the facts previously established in this opinion, which support such a finding and conclusion, the Court finds and concludes that not one of these "equity contribution" type indicia is present here.

In the Government's brief, it is suggested that the proper test is found in United States v. Title Guarantee & Trust Company, 133 F.2d 990, 993 (6 Cir. 1943), where it was stated:

"The essential difference between a stockholder and a creditor is that the stockholder's intention is to embark upon the corporate adventure, taking the risks of loss attendant upon it, so that he may enjoy the chances of profit. The creditor, on the other hand, does not intend to take such risks so far as they may be avoided, but merely to lend his capital to others who do intend to take them."

Therefore, stockholders, it is argued should not be treated for tax purposes as creditors of their corporation, or a parent corporation as a creditor of its subsidiaries, as to assets transferred thereto, "unless they make the transfer with the usual intent of creditors, i. e. to impose an absolute obligation, repayable in any event." The Court finds that the requirements of this test were also adequately met by the transaction in question in this case. Considering all of the relevant factors, the Court finds that the evidence clearly establishes— whether the transaction in question is considered on a step-by-step basis or considered in view of the end result—that

it was the intention of Mr. Woolley that the transfer of assets from Tool, Inc. to Fishing Tool and Equipment Co. be bona fide sales, imposing "an absolute obligation, repayable in any event." Furthermore, the Court finds that there is no evidence which would indicate that the purported sales from Tool, Inc. to the Plaintiff corporations were intended to be anything other than sales. It is clear from the evidence, particularly in view of Mr. Woolley's purposes and the business problems he was attempting to solve, that it was his intention and plan to set up the organization and consummate the transactions involved in such a manner that as an end result he would be in a dual position of investor and creditor of the Plaintiff corporations. The questioned transactions between Tool, Inc. and Fishing Tool and Equipment Co. were intended to be and were in every respect bona fide sales transactions. Furthermore, the installment notes representing the purchase price in these transactions were intended to be exactly what they appear to be, and represent a valid creditor-debtor relationship between Tool, Inc. and the taxpayers. It follows, therefore, that the Plaintiff corporations were entitled to deductions for depreciations on the assets in question calculated on the basis of their cost or the sale price, and in addition were entitled to a deduction for the amounts paid as interest during the tax year in question on the installment notes given to Tool, Inc. as the purchase price for said assets.

In light of the findings and conclusions above made and reached, the Plaintiffs are entitled to recover herein that amount of the deficiency assessment and interest paid by the Plaintiffs that is attributable to the erroneous action by the Internal Revenue Service in disallowing the deductions for depreciation based on the cost of said depreciable assets to the taxpaying corporations, and the erroneous disallowance of the deduction for interest paid during the tax year on the installment notes given as the purchase price in the transactions in question.

The parties having stipulated that, if the Court renders a decision for the Plaintiffs in this cause, the amount of the judgment in accordance therewith will be determined by and agreed to between the parties, for the purpose of entry of judgment, the parties should, within thirty days from the date of this opinion, file a stipulation in this cause setting forth the amount the Plaintiffs, respectively, are entitled to recover in light of the Court's decision herein made. Simultaneously with the filing of such stipulation, the attorneys for the Plaintiffs should present to the Court an appropriate form of judgment allowing Plaintiffs a recovery in the amount set forth in the stipulation and providing that the parties shall pay their own costs.

This opinion, together with the stipulation of the parties to be hereinafter filed in this cause as directed in the preceding paragraph, will constitute the Findings of Fact and Conclusions of Law in this case.