**Laurie W. TOMLINSON, District Director of Internal Revenue for the District of Florida, Appellant,**

v.

**The 1661 CORPORATION, Appellee.**

**No. 23246.**

United States Court of Appeals
Fifth Circuit.

May 9, 1967.

---

Mitchell Rogovin, Asst. Atty. Gen., Richard M. Roberts, C. Moxley Featherston, Acting Asst. Attys. Gen., Lee A. Jackson, Harry Marselli, Meyer Rothwacks, Gilbert E. Andrews, Solomon L. Warhaftig, Attys., Dept. of Justice, Washington, D. C., Edward F. Boardman, U. S. Atty., Tampa, Fla., Virginia Q. Beverly, Asst. U. S. Atty., Jacksonville, Fla., for appellant.

William T. Rogers, Judson Freeman, Jacksonville, Fla., for appellee.

Before MARIS,* BROWN and THORNBERRY, Circuit Judges.

JOHN R. BROWN, Circuit Judge:

The only question presented on this appeal is whether certain advances of funds to the Taxpayer Corporation [1] by its sole shareholders constitutes indebtedness within the meaning of § 163 of the Internal Revenue Code of 1954, 26 U.S.C.A. § 163,[2] or contributions to capital. The Commissioner determined that the advances fell into the capital category and disallowed the claimed deduction for interest accrued on the Corporation's books for the years 1960 through 1962. Upon trial of the tax refund suit, the District Court held for the Taxpayer. The 1661 Corporation v. Tomlinson, M.D.Fla., 1965, 247 F.Supp. 936. We affirm.

The pertinent facts were stipulated by the parties. The Corporation was organized in 1955 for the purpose of constructing, owning and operating a professional office building in Jacksonville, Florida.

---

* Of the Third Circuit, sitting by designation.

1. The 1661 Corporation, incorporated in Florida.

2. "(a) *General Rule.*—There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness."

The charter, as amended, authorized the issuance of 560 shares of stock with a par value of $100 per share. At the organizational meeting, subscriptions were submitted, all by medical doctors, for 180 shares of stock, along with an agreement to advance to the Corporation $400 for each share of stock subscribed. These advances were represented by promissory notes bearing interest at 7% per annum, and payable on or before 15 years after date of issue. The Corporation, while it could have obtained the funds from outsiders, found that the interest rates demanded were prohibitive, and therefore turned to the stockholders for loans on more favorable terms.

On August 23, 1957, a resolution was adopted by the Board authorizing replacement of the 15-year notes by corporate debentures [3] bearing the same interest rate but payable on or before 19 years after date. To assure continuity in the debt and to preclude the loss of any interest accrued on the notes during the interim between their issuance and exchange, the debentures as actually issued reflected that they were issued as of the same date as each original stockholder loan to the Corporation.[4] Interest, payable in semi-annual installments, was cumulative, and accumulated interest had to be paid before any common stock dividends could be declared. Maturity could be accelerated for any default other than the failure to pay interest. Unlike the stock whose transfer was somewhat restricted,[5] the debentures were freely transferable and were secured by a pledge of the full faith and credit of the issuer, by a lien upon all excess [6] lease rentals received by the Corporation, and the proceeds, if any, of a "stockholder's loan sinking fund" to which no deposits

3. It is helpful to set out the bond substantially in full:

"KNOW ALL MEN BY THESE PRESENTS, that THE 1661 CORPORATION * * * for value received, promises to pay to .................. on or before nineteen (19) years from the date hereof, the principal sum of ........ Dollars ($.......), with interest thereon at the rate of seven per cent (7%) per annum, payable semi-annually on the fifth day of January and the fifth day of July of each year. Both principal of and interest on this Debenture are payable * * * at the principal office of the Corporation * * *.

"If for any reason any interest payment is not made as above provided, such interest shall be cumulative. The amount of any interest so accumulated shall be paid before any dividends may be declared and paid on the common stock of the Corporation.

"This Debenture and the interest thereon is payable from and secured by a lien upon and a pledge of the excess rentals received by said Corporation under leases covering the building owned by said Corporation, and by the proceeds of the Stockholders' Loan Sinking Fund of said Corporation, and to the extent necessary, the full faith and credit of said Corporation is also pledged for the payment of the principal of and interest on said Debenture as the same shall become due; all in the manner provided in that certain Resolution adopted by the Directors of said Corporation on August 23, 1957, the terms and conditions of which are incorporated herein by reference and are made a part of this instrument.

"If default be made in the performance of any agreement contained herein, other than the payment of any interest installment, then at the option of the holder of same, the principal sum then remaining unpaid, together with accrued interest, shall immediately become due and collectible, without notice, time being of the essence of this contract, said principal sum and said accrued interest shall both bear interest at the rate of ten per centum (10%) per annum from such time until paid."

4. This is covered by counsel's post-argument stipulation.

5. Taxpayer's by-laws provide that "The holder of shares of stock desiring to sell or otherwise transfer or dispose of such shares shall make formal application to the Board of Directors for so doing, and thereafter the Corporation shall have the exclusive option, for a period of thirty (30) days within which to purchase such shares of stock at the current book value thereof. If this option is not exercised within such period, the holder may then sell or otherwise transfer or dispose of his shares of stock as he may see fit."

6. This included all rentals not pledged or assigned as security for mortgage loans made or to be made upon the Corporate property.

had been made. By a provision incorporating the terms and conditions of the enabling resolution, the debentures were subordinated to the mortgage indebtedness against the corporate property.[7]

During the years 1960 through 1962, the Corporation had issued and outstanding 346 shares of capital stock for a total capitalization of $34,600. The related stockholder advances totaled $138,400, and the interest on these advances, accrued but unpaid, is the subject of the present dispute.

The question whether an advance of money by persons who are the sole stockholders of a corporation to their wholly owned corporation in return for a promise to repay such advances creates an "indebtedness" within the meaning of the statute (note 2, supra) or amounts to a contribution to capital, has often been considered by this Court. Rowan v. United States, 5 Cir., 1955, 219 F.2d 51; Campbell v. Carter Foundation Production Co., 5 Cir., 1963, 322 F.2d 827; Montclair, Inc. v. Commissioner of Internal Revenue, 5 Cir., 1963, 318 F.2d 38; Aronov Constr. Co. v. United States, M.D.Ala., N.D., 1963, 223 F.Supp. 175, aff'd per curiam, 5 Cir., 1964, 338 F.2d 337; United States v. Snyder Brothers Co., 5 Cir., 1966, 367 F.2d 980 [1966]. Although the results are diverse, sometimes favoring the taxpayer, sometimes the Government, the cases are in accord in applying with an even hand the controlling legal principles for determining the outcome of the present litigation.

■ Because of the many variables involved in financing transactions such as the one presented here, it is clear that each case must be judged on its own unique fact situation. The Code requires three things before interest can be deducted: (1) an indebtedness, (2) interest on the indebtedness, (3) which has been paid or accrued within the tax year. 4A Mertens, Federal Income Taxation § 26.-01 at p. 3 (1966 Revision); Campbell v. Carter Foundation Production Co., supra, 322 F.2d at 831. That the accrual requirement is satisfied is not here questioned. Nor is there any dispute that if—and the if is the big if of the case—the debentures constituted "indebtedness" the second requirement will be satisfied.[8] Therefore the sole issue to be resolved on this appeal is whether the District Court correctly determined that the debentures constituted an "indebtedness" within the statutory meaning.

■ The term "indebtedness" implies an existing unconditional and legally enforceable obligation to pay. 4A Mertens, Federal Income Taxation § 26.04 (1966 Revision). In the course of determining whether a particular transaction creates a valid and subsisting "indebtedness" within the statutory meaning, this Court has in the past analyzed the pertinent facts of the transaction in connection with certain criteria considered to be controlling. Generally, these criteria are designed to disclose the real nature of the transaction in question—that is whether it exhibits the characteristics of a bona-fide loan to the corporation which is expected, indeed, may be compelled, to be repaid in full at some future date, or whether as a formalized attempt to achieve the desired tax result while lacking in necessary substance, it merely parades under the false colors of such a transaction. The District Court, utilizing the criteria set out by the Court in Montclair Inc. v. Commissioner of In-

---

7. The resolution adopted by the board of directors on August 23, 1957, included a provision that "the principal of [the] loans shall be repayable after the corporation had discharged the mortgage indebtedness against said property; * * *."

8. In this context, "interest" is given its ordinary meaning, Campbell v. Carter Foundation Production Co., supra, 322 F.2d at 831, that is "compensation for the use or forebearance of money" or the "amount which one has contracted to pay for the use of borrowed money." Deputy v. DuPont, 1940, 308 U.S. 488, 497–498, 60 S.Ct. 363, 368, 84 L.Ed. 416, 424.

ternal Revenue, supra,[9] followed this procedure in this case, and its analysis tracks it item by item, (1) through (11).[10] The 1661 Corporation v. Tomlinson, supra, 247 F.Supp. at 938.

The Government, offering no contest that these are the pertinent criteria for consideration, asserts only that the District Court failed correctly to apply these criteria to what was actually done by the Corporation as distinguished from appearances thereby exalting formalities over the substance of the transaction.[11]

More concretely, the Government levelled its attack on the District Court's determinations with respect to four of the criteria.[12]

The Government first attacks the conclusion that "[5] the debenture holders as such have no right to participate in

9. " 'There are at least eleven separate determining factors generally used by the courts in determining whether amounts advanced to a corporation constitute equity capital or indebtedness. They are (1) the names given to the certificates evidencing the indebtedness; (2) the presence or absence of a maturity date; (3) the source of the payments; (4) the right to enforce the payment of principal and interest; (5) participation in management; (6) a status equal to or inferior to that of regular corporate creditors; (7) the intent of the parties; (8) "thin" or adequate capitalization; (9) identity of interest between creditor and stockholder; (10) payment of interest only out of "dividend" money; (11) the ability of the corporation to obtain loans from outside lending institutions." O. H. Kruse Grain & Milling Co. v. Commissioner [of Internal Revenue,] 9 Cir. 1960, 279 F.2d 123, 125. See Mertens Federal Income Taxation, § 26.10c." Montclair, Inc. v. Commissioner of Internal Revenue, supra, 318 F.2d at 40.

To this might be added other criteria, for example, "that the initial payments, both capital and advances, were all made for acquisition of capital assets, as in Commissioner of Internal Revenue v. Meridian & Thirteenth Realty Co., 7 Cir., 132 F.2d 182, and Matthiessen v. Commissioner [of Internal Revenue,] 2 Cir., 194 F.2d 659; or the issuance of certificates of stock, such as Meridian & Thirteenth Realty Co., supra; * * * inordinately postponed due date; * * * or payment of advances as initial funds to start the corporate life, as in Janeway v. Commissioner [of Internal Revenue,] 2 Cir., 147 F.2d 602; * * *." Rowan v. United States, supra, 219 F.2d 51, 55.

10. For ease of reference, the numbers are enclosed in brackets, e. g. [3].
"[1] *Name.* The instruments evidencing the indebtedness are called 'debentures', and are in form and substance debentures. All references in the corporations' minutes and books of account are to loans.'

"[2] *Maturity Date.* The debentures have a definite maturity date, to-wit, 19 years after date.
"[3] *Source of Payment.* Payment is required to be paid from corporate funds, not necessarily from earnings and profits.
"[4] *Right to Enforce Payment.* There is a definite right to enforce payment upon default or at maturity.
"[5] *Participation in Management.* The debenture holders as such have no right to participate in management.
"[6] *Relationship to General Creditors.* The rights of the debenture holders are equal to those of general creditors.
"[7] *Intent of Parties.* The form of the instrument itself, as well as corporate minutes authorizing it, plainly show that both the corporation and the lenders intended to create an unconditional and legally enforceable obligation for the payment of money.
"[8] *'Thin' or Adequate Capitalization.* The ratio of debt to capital was not excessive. The ratio of debentures to stock was 4 to 1.
"[9] *Identity Between Creditor and Stockholder.* The stockholders and debenture holders were one and the same.
"[10] *Source of Interest Payment.* Interest was payable out of general corporate funds with no obligation to pay the same out of 'dividend' money.
"[11] *Ability of Corporation to Obtain Loans Elsewhere.* The Corporation was unable to make adequate loans from outside sources, although it was able to obtain a substantial loan."

11. In its brief, the Government states that the Court "confined its inquiry solely to the form of the 'debentures' and of the corporate minutes authorizing their issuance, using the criteria as a check list to determine whether the formalities, which it mistakenly believed to be controlling, had been complied with."

12. Specifically, the controverted conclusions are those regarding [4] "right to enforce payment," [5] "participation in management" (which derivatively involv-

management." Again, the Government does not challenge this directly. Rather, obliquely it urges that since the debentures were issued to the stockholders in the same proportions as their stock holdings, there was no need for debenture provision stipulating participation in control because the debenture holder already has a pro rata part of the voting control through his stock ownership. Consequently, the argument runs, the Court erred by restricting its consideration solely to the debt instrument itself to the exclusion of the surrounding facts and circumstances. The contention, of course, is grounded on the identity of ownership between the stockholders and their wholly owned corporation, but more than that, on its concomitant equal ratio of debt-equity making additional control safeguards in the debentures superfluous.

■■ Identity of ownership does not, of itself, prevent the advance from being treated as indebtedness. United States v. Snyder Brothers Co. supra, 367 F.2d 980 [1966]. It is only one of the factors to be considered in assessing the true nature of the transaction. Where the creditors as stockholders have a proprietary interest in proportion to their loans, this may subject the transaction to "close scrutiny" but does not necessarily preclude treating the transaction as a valid indebtedness. Wilshire & Western Sandwiches, Inc. v. Commissioner of Internal Revenue, 9 Cir., 1959, 175 F.2d 718, 721; Earle v. W. J. Jones & Son, 9 Cir., 1952,

200 F.2d 846, 850. We think the Government's argument fails to take in to account the fact that, while there is a restriction placed on the sale of the stock, no similar restriction is found in the debentures which therefore are freely transferable.[13] Such a transfer would remove the proportional participation and control. It is no answer to point out that no such transfers have occurred or even are contemplated—this may be the result of a variety of factors, not the least of which could be the belief of the doctors that the investment is a good one which will be repaid, both principal and interest, at the appointed date. It is enough to say that the existence of the right of free transferability substantially dispels the element of proportional control, leaving the mere identity of ownership as only one factor to be weighed in reaching the appropriate result.

■■ Another attack centers on the relationship of the debenture holders to the creditors of the Corporation. As previously stated, by a provision incorporating the Board resolution, the debentures were subordinated to the "mortgage indebtedness against said property" (note 8, supra).[14] But this hardly means that the District Court erred in concluding that the "[6] rights of the debenture holders are equal to those of the *general* creditors" (emphasis added). Here again, subordination is but one of the factors for consideration, and one which this Court, in Aronov Constr. Co. v.

ed [9] "identity between creditor and stockholder"), [6] "relationship to general creditors," and [8] "'thin' or 'adequate' capitalization" (see note 10, supra).

13. See note 5, supra. So far as this record reveals, this stock restriction was in no way tied into this financing problem or stockholder loans. With stock transfer limited by the 30-day option, but with no such limitation on the debentures ownership, and hence potential control, could part at the sole discretion of the stockholder lender. Neither the Corporation nor its remaining stockholder owners could prevent the debentures getting into the market at any time or any place.

14. This included a permanent first mortgage loan from Aetna Life Ins. Co. for $275,000, with interest at 5½% over an 18-year period, and a second mortgage loan from Foremost Properties, Inc. for $40,000 at 6% payable in 10 years. Additional financing included unsecured loans in the amounts of $9,000 from Atlantic National Bank and an equal amount from two of the stockholders. The only loan remaining outstanding at the date of the trial was the first mortgage loan to Aetna. There was an interim financing construction loan for $250,000.

United States, supra, considered along with six other factors—all adverse to the taxpayer [15]—in holding that the payments were not deductible as interest but rather constituted dividends. Where, however, the decided weight of the findings favor the taxpayer, we are unable to say that the District Court's determination that the mere subordination to outstanding mortgage indebtedness would not disqualify the interest deduction is clearly erroneous.

The factor of subordination also serves to distinguish this Court's recent holding in United States v. Snyder Brothers Co., supra. There it was expressly provided that the debentures would "be subordinated to *all* indebtedness of the corporation, whether already incurred or *to be incurred at any time in the future*", (emphasis added) with no limit on the amount of such indebtedness. 367 F.2d at 981. Clearly such a provision weighs heavily toward an equity participation and against the existence of a bona-fide debtor-creditor relationship.[16] In our

case, however, the debenture holders possess rights equal to those of the general creditors of the corporation, since their debt is subordinated only to the outstanding mortgage indebtedness of Aetna. This does, to be sure, give an apparent theoretical preference to the mortgage debt. But in reality this priority is built in by the lien and enforcement provisions of the mortgage. There are other distinquishing factors. Thus in *Snyder,* the Court found that no limit was placed on the payment of dividends to stockholders [here, no dividends may be paid so long as any interest is in arrears], and that debentures could be transferred only on the books of the company by proper written assignment [here, no such restriction exists].

■ The Government's assertion that Taxpayer is a "thin corporation" warrants only brief mention. Assuming, without deciding, whether or to what extent this criterion remains a pertinent consideration in this Circuit,[17] we conclude that the District Court on the facts

15. The District Court found that
"(1) the payment schedule to the transferring shareholders was ignored, (2) the sole source of the scheduled payments was to have come from the rents under a one-year lease; (3) the Aronov's had complete control and management of the corporation; (4) the stockholders agreed that their 'debt' be subordinated to those of other creditors; (5) the capitalization of the corporation was inadequate; (6) there was complete identity between the 'creditors' and stockholders, and (7) no dividends were declared by the taxpayer."
Aronov Constr. Co. v. United States, supra, 223 F.Supp. 175, 177.

16. The Government correctly observes that the "willingness to subject his investment to the primary risks of the enterprise is what distinguishes the stockholder from the creditor." 4A Mertens, Federal Income Taxation § 26.06, at 35 (1966 Revision). Thus, a creditor ordinarily will insist on sharing with other creditors in the assets of the business in the event of liquidation or dissolution. This was precluded by the subordination provision in *Snyder Brothers.*

17. "It would obviously work an unwarranted inference by the courts in ordinary

and perfectly proper business procedures for us to say that there can be established, as a matter of hindsight, a ratio of stockholder owned debt to the capital of the debtor corporation. * * * It is entirely within the competence of Congress to provide by statute for such ratio if it deems it advisable or necessary within the scheme of Federal taxation. It is not within our province to do so. Nor would it further the desirable end of certainty in taxes for us to do so." Rowan v. United States, supra, 219 F.2d 51, 55. See also Sun Properties v. United States, 5 Cir., 1955, 220 F.2d 171, 175.
Undoubtedly the Court has since receded from this absolute.
"This Circuit has rejected the notion that thin capitalization alone will justify the Commissioner in designating an indebtedness as capital, but recognizes that this factor need not be ignored in determining whether all of the facts authorize the inference of an intent to make a contribution to capital. Rowan v. United States, 5 Cir., 1955, 219 F.2d 51."
Montclair, Inc. v. Commissioner of Internal Revenue, supra, 318 F.2d at 40. See also United States v. Henderson, 5 Cir., 1967, 375 F.2d 36, 40 [No. 22152, Mar. 23, 1967].

of this case could find that the "[8] ratio of debt to capital was not excessive." [18]

▮▮▮▮ Nor is there any merit to the argument that while the debenture holders had the [4] "right to enforce payment" of interest, no payments were in fact made, notwithstanding that funds were available. Here again, it is not for this Court to speculate on the business reasons for the Corporation's action. The statute allows a deduction for accruals as much as for payments. And there is no evidence in the record to support the Government's assertion that an understanding existed between the Corporation and debenture holders that interest would be withheld till the mortgage debt was discharged.[19] We are thus unable to say that the District Court's finding in this regard is clearly erroneous.

Having disposed of the Commissioner's contentions, two further matters warrant comment.

▮▮▮▮ Pressing heavily extravagant statements found in many judicial opinions, the Taxpayer continually emphasizes in its brief that *intent* of the parties is the ultimate consideration before the Court, and that it is manifest that here the parties intended the transaction to be treated for tax purposes as a valid "indebtedness." Were intent the sole consideration, we would have to agree that the parties here intended, both subjectively and objectively, to create an indebtedness. But the question is not so simple. Despite what many decisions state or imply, the issue is not so much what the parties intended, but whether for tax purposes the transaction will be so recognized. As we recently stated, where "the instruments involved are entirely conventional in form and contain no ambiguity on their face * * * the problem is not one of ascertaining 'intent,' since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes." United States v. Snyder Brothers Co., supra, 367 F. 2d at 982.

▮▮▮▮ Finally, the Court was considerably troubled at first by the Government's assertions that the stockholder loans were necessary in order to obtain the required initial funds to begin the corporate project, as the Corporation was unable to obtain these funds through

18. The additional statement by the Court that the "ratio of debentures to stock was 4 to 1" appears gratuitous and erroneous as well. Clearly proper application of this criterion would require consideration of the total outstanding corporate debt in relation to the corporate equity. On the basis of the Government's computations, the latter method would reflect, as of December 31, 1957, a debt-equity ratio of 14.6 to 1. There is nothing, however, to compel us to hold that that this ratio is excessive. Cf. Aronov Constr. Co. v. United States, supra ($1000 paid-in capital, $150,000 mortgage debt). *Rowan* is still very much alive in denying to Judges the prescience to determine as a *legal* matter a thing as vital as this to businessmen without an adequate factual basis for the asserted unreasonableness of the ratio. Leverage is the aim of many entrepreneurs, many of whom are quite successful in securing financing on high ratios.

19. Neither this nor any other part of our holding here is contrary to our very recent decision in United States v. Henderson, 5 Cir., 1967, 375 F.2d 36 [No. 22152, Mar. 23, 1957]. Although the Court there noted that while "the majority of the 'notes' evincing the advances became due during these years no part of the 'interest' or 'principal' was ever paid," this did not stand alone. Rather, the Court went on, "In fact, it was generally understood that repayment was contingent upon the success of the business and that repayment was to be made only out of profits." In addition, "taxpayer's advances were * * * subordinated to [the Corporation's] indebtedness to its other creditors", whose obligations were being paid while taxpayer's obligations were not even though interest and principal on a majority of the notes was past due. Finally, "thin capitalization" was there a factor which, along with those mentioned above, made the "conclusion inescapable" that the transactions resulted in a contribution to capital, not indebtedness.

**300**

commercial loans from outside sources. Especially was this so in view of the Judge's findings.[20] We are now convinced that this was not the case. The Government in its brief makes footnote reference to the testimony of one of the Corporation's original directors and its treasurer during the formative years, noting that "taxpayer's incorporators had originally sought to obtain from outsiders the financing that taxpayer would require in addition to the proceeds from the sale of stock and the first mortgage loan on its property, the latter of which would provide only slightly in excess of one half of the almost $500,000 that was to be invested in the property. The *rate of return that outsiders were demanding with respect to such financing was found, however, to be prohibitive.* Accordingly, it was determined that the necessary funds would come from the stockholders." (Emphasis added.) Inability to obtain outside financing is not the same as, and cannot be equated with, the ability to obtain outside financing but at a cost which to the businessman is economically unwise. That outsiders offer credit only on prohibitive terms does not transmute a stockholder loan into equity capital. The Code does not specify from what source needed investment funds must be derived. We cannot, by manipulation of tax law, preclude the parties from exercising sound business judgment in obtaining needed investment funds at the most favorable rate possible, whether it be a commercial loan, or, more likely and as is the case here, a loan from private interested sources with sufficient faith in the success of the venture and their ultimate repayment to delete or minimize the "risk factor" in their rate of return. We must not forget that while the principles articulated in *Montclair* continue to furnish helpful guidelines, application of these so-called factors, or any one of them, must be tempered by an awareness that from our Commission, as Judges we are not qualified, or certainly not the best qualified persons, to determine the many intricacies of transactions in the business world. Our guidance in making fact decisions and in declaring or applying legal principles must come from the enlightenment afforded by an evidentiary record reflecting the facts the business world regards as significant. This record amply supported the Judge's conclusion that the loans from insider-stockholders constituted for tax purposes indebtedness, not capital contributions.

Affirmed.

**20.** [11] "The Corporation was unable to make adequate loans from outside sources, although it was able to obtain a substantial loan."