UNIVERSAL RACQUETBALL ROCKVILLE CENTRE CORPORATION, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Universal Raquetball Rockville Centre Corp. v. Commissioner
Docket No. 30265-83.
United States Tax Court
T.C. Memo 1986-363; 1986 Tax Ct. Memo LEXIS 236; 52 T.C.M. (CCH) 143; T.C.M. (RIA) 86363; August 11, 1986. John A. Matthews, Jr., for the petitioner. Laurence D. Ziegler, for the respondent. TANNENWALD
MEMORANDUM OPINION TANNENWALD, Judge: Respondent determined a deficiency of $24,696 in petitioner's Federal *237 income tax for the taxable year ending June 30, 1980. The issue for decision is whether petitioner is entitled to an interest deduction of $56,551 based on $377,040 of long-term notes or whether such deduction should be disallowed under sections 163[1] and 385 since the advances did not constitute debt of petitioner but were contributions to its capital. This case was submitted fully stipulated under Rule 122. This reference incorporates herein the stipulation of facts and attached exhibits. Petitioner maintained its principal place of business in Rockville Centre, New York at the time the petition herein was filed. Petitioner timely filed its U.S. Corporation Income Tax Return for the taxable year ending June 30, 1980, with the Internal Revenue Service Center, Holtsville, New York. During the year in issue, petitioner was on the accrual basis of accounting. Petitioner was incorporated on March 2, 1978 to conduct and operate a racquetball facility. *238 At the time of its incorporation, petitioner issued 94.99 shares of capital stock which were owned as follows: Shareholder
Number of Shares
William P. Farrell, Jr.
29.57
James O'Neill
16.00
James R. Farrell
3.00
Olympia Sports Products, Inc.
3.57
Walter Gatz
19.00
Peter F. Yaman
3.00
Vincent Zuaro
5.00
Ronald P. McNavich
1.00
B. Lawson Greenhalgh, Jr.
2.00
Alan M. Butler
1.43
Jerome E. Seckler
1.43
Peter J. Cimino
2.85
William S. Swartz
7.14
Total Shares
94.99
William Farrell, Jr. was the sole shareholder of Olympia Sports Products, Inc; James Farrell is the brother of William Farrell, Jr. and a brother-in-law of James O'Neill. Of the original 94.99 shares issued by petitioner, 56 shares were sold to the shareholders for $1,750 each (total price $97,990 [2]) and the balance of 38.99 shares (40 percent) was given for no consideration to William Farrell, Jr., James O'Neill, Walter Gatz, and James Farrell. *239 On July 1, 1978, the shareholders named below [3] entered into transactions with petitioner whereby monies totaling $377,040 were given to petitioner in return for long-term promissory notes. Shareholder
Amount
William Farrell, Jr.
$ 24,860
Walter Gatz
98,000
James O'Neill
92,000
William Swartz
42,860
Peter Yaman
18,000
Vincent Zuaro
30,000
James Farrell
10,000
Alan Butler
8,570
Peter Cimino
17,180
B. Lawson Greenhalgh, Jr.
12,000
Jerome Seckler
8,570
Ronald McNavich
6,000
Carl Lehmann
9,000
Total
$377,040
*240 These notes were all due on June 30, 1987, with interest payable annually at 12 percent, and were classified by petitioner on its financial statements as Long Term Liabilities -- Shareholders. [4] They were unsecured. It was agreed that interest due on the notes would be paid only if there were sufficient funds available to pay the interest due on all of the notes. On July 1, 1979, the original notes were replaced with new notes, the only change being in the interest rate, which was increased from 12 percent to 15 percent. Petitioner sought these funds from its shareholders because, after obtaining a first mortgage on its real estate and bank financing in the form of equipment leases, petitioner was unable to secure additional funds from conventional sources such as banks, since such sources were either not interested in supplying the monies or the costs were excessive. The $377,040 petitioner received from its shareholders was used to pay for *241 the construction costs and initial working capital of petitioner. No interest payments have been made by petitioner to the shareholders with respect to either the notes that were given originally on July 1, 1978, or the replacement notes issued on July 1, 1979. The notes to the financial statements of petitioner for the fiscal year ending June 30, 1980 (the year before the Court) contain the following statement: Notes payable shareholders (long term) are payable on demand with interest at 15% per annum, payable semi-annually. At June 30, 1980 interest had been accrued but not paid on these shareholders notes. It is not expected that these loans will be repaid in the near future. [Emphasis added.] Subsequent financial statements for the fiscal years ending June 30, 1981, June 30, 1982 and June 30, 1983, eliminated the "emphasis added" material and substituted "on June 30, 1987" for the words "on demand." The notes to the financial statements ending June 30, 1984 used this same language and added the sentence, "Since July 1, 1983 the loans do not accrue interest." Petitioner has not created any reserve or sinking fund to pay the principal of the long-term notes *242 or the interest due thereon. Additional short-term unsecured loans totalling $392,941 were made by various shareholders and third parties to petitioner during the period July 1978 through June 1983. Petitioner has repaid $282,441 of these loans. Of these total amounts, $284,341 in loans and $184,341 in repayments were in respect of funds advanced by petitioner's shareholders. Interest payments on the short-term loans were paid when due to both the shareholders and the third parties. On January 4, 1979, petitioner entered into a contract with Macrolease International Corporation ("Macrolease") whereby various items of equipment were leased to petitioner to be used in its racquetball facility, and petitioner was given an option to purchase the quipment at the end of the lease for the payment of one dollar. The total cost of the equipment was $133,749.84 of which $7,961.30 was paid in advance and the balance was evidenced by a promissory note requiring 79 payments of $1,592.26. Petitioner's shareholders guaranteed the payment of this note, as well as the payment of any rents or installments when due of any existing or future indebtedness and liability from petitioner to Macrolease. *243 Macrolease was given a security interest in the equipment which was subject to the lease, and pursuant to an agreement entered into by petitioner and all of its shareholders on January 22, 1979, petitioner's obligation to its shareholders for the interest and principal due on the $377,040 of long-term notes was subordinated to petitioner's obligation to pay Macrolease in full any and all indebtedness then existing or thereafter created. Petitioner purchased in 1978 the property on which its racquetball facility is located for a total price of $540,000, of which $120,000 was paid in cash and the balance by a mortgage of $420,000 payable over 30 years. The construction cost of the racquetball facility was $1,236,673 as of June 30, 1980, and the machinery and equipment as of that date cost $333,481. The debt to equity ratios of petitioner as of June 30, 1979 were 5.18:1 as an outside ratio and 3.27:1 as an inside ratio, to be calculated as per Proposed Regulation section 1.385-6(g) and (h), [5] which has since been withdrawn by respondent (see p. 11, infra). Petitioner's after tax income (loss) for the fiscal years ending June 30, 1979 through June 30, 1984 was as follows: *244 Fiscal Years Ending
Net Income (Loss)
6/30/79
$91,361 6/30/80
74,817 6/30/81
94,598 6/30/82
94,322 6/30/83
(67,785)
6/30/84
7,412
The issue for decision is whether the $377,040 advanced by the shareholders to petitioner in the form of long-term promissory notes constituted an actual indebtedness to the corporation, entitling petitioner to deduct under section 163(a) $56,551 in interest which accrued on these notes during the taxable year ending June 30, 1980. Respondent argues that this deduction should be disallowed because the notes did not constitute bona fide indebtedness, but were instead simply contributions to petitioner's capital. For the reasons hereinafter set forth, we agree with respondent. *245 In determining whether monies paid to a corporation by its stockholders constitute debt or equity, we focus not on the form of the transaction but on its substance. Gregory v. Helvering,293 U.S. 465 (1935). As the Second Circuit Court of Appeals noted in Gilbert v. Commissioner,248 F.2d 399, 404 (2d Cir. 1957), remanding a Memorandum Opinion of this Court, "not every advance cast in the form of a loan gives rise to an 'indebtedness' which will justify a tax deduction." It must be proven by petitioner ( Matthiessen v. Commissioner,194 F.2d 659, 661 (2d Cir. 1952), affg. 16 T.C. 781 (1951); Rule 142(a)), that the "loan" is not "so risky that it can properly be regarded only as venture capital." Gilbert v. Commissioner,248 F.2d at 407. Or to put it another way, an advance can be found to be a "contribution to risk capital" rather than merely a "risky loan". Motel Company v. Commissioner,340 F.2d 445, 446 (2d Cir. 1965), affg. a Memorandum Opinion of this Court. Moreover, when dealing with instruments such as those in the instant case which are entirely conventional in form *246 and contain no ambiguity on their face * * * the problem is not one of ascertaining "intent," since the parties have objectively manifested their intent. It is a problem of whether the intent and acts of these parties should be disregarded in characterizing the transaction for federal tax purposes. [Kraft Foods Co. v. Commissioner,232 F.2d 118, 123 (2d Cir. 1956), revg. on other grounds 21 T.C. 513 (1954). En. ref. omitted.] Despite a plethora of cases, no bright line test has emerged to aid us in making such a determination. To the contrary, our decision "must be made in the light of all the facts of the particular case." Gilbert v. Commissioner,262 F.2d 512, 514 (2d Cir. 1959), affg. a Memorandum Opinion of this Court. Furthermore, "[t]here is no one characteristic * * * which can be said to be decisive in the determination of whether the obligations are risk investments in the corporations or debts." John Kelley Co. v. Commissioner,326 U.S. 521, 530 (1946). In examining the factors which bear on whether the *247 notes issued by petitioner are debt or equity, we look initially to section 385, which was added to the Internal Revenue Code as part of the Tax Reform Act of 1969, Pub. L. 91-172, 83 Stat. 613, and authorizes the Secretary of the Treasury to prescribe "regulations as may be necessary or appropriate to determine whether an interest in a corporation is to be treated * * * as stock or indebtedness." Section 385(a). Section 385(b) requires that these regulations set forth factors which are to be used in making such a determination, which may include but are not limited to:
(1) whether there is a written unconditional promise to pay on demand or on a specified date a sum certain in money in return for an adequate consideration in money or money's worth, and to pay a fixed rate of interest, (2) whether there is subordination to or preference over any indebtedness of the corporation, (3) the ratio of debt to equity of the corporation, (4) whether there is convertibility into the stock of the corporation, and (5) the relationship between holdings of stock in the corporation and holdings of the interest in question. Unfortunately, although regulations were finally proposed *248 in 1980 and adopted later that same year (T.D. 7747, 1981-1 C.B. 141), they never became effective; they were eventually withdrawn in 1983 (T.D. 7920, 1983-2 C.B. 69), and have yet to be resurrected.[6] Thus, while section 385 is still helpful as a general guide in our deliberations, resolution of the issue herein requires us to examine the myriad of factors, see Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980), which the courts have considered in dealing with the debt versus equity question. Since certain factors may be important in one set of circumstances but not in another, we will limit our observations to the specific facts of this case which we consider to be of particular significance in making our determination that the "loans" were in fact contributions to petitioner's capital. In so doing, we look for guidance primarily to the opinions of the Court of Appeals for the Second Circuit, to which an appeal in this case would lie. See Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 376 (1973). [7]
*249 We note at the outset that certain factors do point in petitioner's direction. Thus, the promissory notes bear all the formal indicia of debt instruments. However, the issue herein is whether the surrounding circumstances support the conclusion that there was an indebtedness in substance as well as form. See Ambassador Apartments, Inc. v. Commissioner,50 T.C. 236, 244 (1968), affd. 406 F.2d 288 (2d Cir. 1969). We also recognize that the absence of proportionality between the shareholders' interests in petitioner's stock and their ownership of petitioner's "debt" obligations is a factor often considered by the courts as indicating a debt as opposed to equity investment. Compare Estate of Mixon v. United States,464 F.2d 394, 409 (5th Cir. 1972), with Slappey Drive Industrial Park v. United States,561 F.2d 572, 583-584 (5th Cir. 1977). However, in the same way that "[w]here the creditors as stockholders have a proprietary interest in proportion to their loans, this may subject the transaction to 'close scrutiny' but *250 does not necessarily preclude treating the transaction as a valid indebtedness," Tomlinson v. 1661 Corporation,377 F.2d 291, 297 (5th Cir. 1967), the corollary is also necessarily true, namely, that the absence of such identity of ownership is not dispositive of a finding that the transaction constitutes a valid loan but is only one of many factors to be considered in making such a determination. Moreover, we note that only stockholders were noteholders herein and that, at least with respect to some of the substantial shareholders/noteholders, there were family relationships and, in one instance, ownership of petitioner's stock by one individual and also by his wholly-owned corporation. See Slappey Drive Industrial Park v. United States,supra at 584. Similarly, the added fact that the notes did not provide for convertibility to stock does not in and of itself prove that they were debt instruments. Thus, although the foregoing factors are suggestive of the existence of a bona fide debt "[t]he object of the inquiry is not [simply] to count factors, but to evaluate them." Tyler v. Tomlinson,414 F.2d 844, 848 (5th Cir. 1969). We now *251 turn to an analysis of the factors which point to a conclusion that the notes represented equity rather than debt. The first factor is whether petitioner "could have obtained debt financing on similar terms from an independent creditor." Litton Business Systems, Inc. v. Commissioner,supra at 379; see also Nassau Lens Co. v. Commissioner,308 F.2d 39, 47 (2d Cir. 1962), remanding on other grounds 35 T.C. 268 (1960); Gilbert v. Commissioner,248 F.2d at 406. Petitioner has admitted that it was the inability to secure similar loans from outside lenders that led it to seek financing from its shareholders in the first place. Petitioner's difficulty in obtaining such outside financing only serves to underscore the inherent defects in the instant transactions which militate against the conclusion that, as a matter of "substantial economic reality" (see Gilbert v. Commissioner,262 F.2d at 514), the notes constitute bona fide loans entered into as part of a legitimate debtor-creditor relationship. Even absent *252 petitioner's admission, it is highly unlikely that a disinterested lender would have made initial, unsecured loans of almost $400,000 in order to provide petitioner with the working capital necessary to start up its business. See Matthiessen v. Commissioner,16 T.C. 781, 786 (1951), affd. 194 F.2d 659 (2d Cir. 1952). However, even assuming arguendo that petitioner could have secured such start-up capital from an outside creditor, it is doubtful, given the inherent risk of any new venture, that such a creditor would have also agreed to (1) no security for the loans; (2) subordinate the loans to the present and future obligations of another outside creditor; (3) forego the current payment of interest unless there were sufficient funds available to pay all of the noteholders; and (4) not require that petitioner set up some type of sinking of reserve fund to provide for the orderly accumulation of funds over the years to pay back the loans when they came due. The courts have often looked at the lack of security as a factor to be considered in determining whether *253 a loan should be recognized as such for tax purposes. E.g., In re Lane,742 F.2d 1311, 1317 (11th Cir. 1984); Tyler v. Tomlinson,supra at 849; Gilbert v. Commissioner,262 F.2d at 513. Similarly, the subordination of a loan to another creditor is a factor to be looked at in determining whether such loan lacks economic reality. Nassau Lens Co. v. Commissioner,supra at 47; Charter Wire, Inc. v. United States,309 F.2d 879, 881 (7th Cir. 1962). We recognize that "[s]ubordination to general creditors is not necessarily indicative of a stock interest," Kraft Foods Co. v. Commissioner,232 F.2d at 125, and that petitioner correctly points out that the notes were only subordinated to the Macrolease leases, and not to all general creditors. However, the Macrolease subordination agreement subordinated the shareholders' interests not only to current fixed obligations, but also to all future, and as yet undetermined and potentially unlimited, debt liability of petitioner to Macrolease. We are hard pressed to think of an outside creditor who, given the inherent risk in the *254 start-up of petitioner's business and the lack of any collateral to secure the loans, would advance such large sums of money subject to such an open-ended agreement. Indeed, Macrolease still felt it necessary to go even further and secure personal guarantees from each of the shareholders despite the subordination agreement and a security interest in the leased equipment. In this connection, we reject petitioner's argument that the presence of the guarantees made the subordination undertaking meaningless. The subordination agreement conferred important direct rights on Macrolease with respect to petitioner's assets in the event of petitioner's financial difficulty, without the necessity of making separate claims against each shareholder/noteholder under the guarantees. We find it equally hard to conceive of an outside lender who would agree not to be paid his interest when due unless there were sufficient funds at such time to pay each and every noteholder. Such an agreement points towards an equity investment in which stockholders receive dividends, which are directly dependent on the success of the business venture. Moreover, we think that, under all the circumstances herein, *255 an outside lender would have required that a sinking fund be established as an assurance that funds would be available to repay the loans when due. Consequently, the absence of such a provision, in respect of the repayment of the notes herein, is another factor which argues against petitioner's claim that a true debtor-creditor relationship existed between it and the shareholders/noteholders. In re Lane,supra at 1317; United States v. Snyder Brothers Co.,367 F.2d 980, 984 (5th Cir. 1966); Charter Wire, Inc. v. United States,supra at 881; National Farmers Union Service Corp. v. United States, an unreported case ( D. Colo. 1967, 19 AFTR 2d 67-437, 67-1 USTC par. 9234), affd. 400 F.2d 483 (10th Cir. 1968). The next factor is petitioner's failure to make even a single interest payment with respect to the shareholder notes, and the shareholders' passive acceptance of this circumstance. As the Fifth Circuit Court of Appeals has so aptly explained: [t]he failure to insist that the corporations pay the interest *256 that the agreements provided underscores the inference; "a true lender is concerned with interest." * * * When a corporate contributor seeks no interest, it becomes abundantly clear that the compensation he seeks is that of an equity interest: a share of the profits or an increase in the value of his shareholdings. * * * [Slappey Drive Industrial Park v. United States,561 F.2d at 582. Citations omitted.] See also Texas Farm Bureau v. United States,725 F.2d 307, 314 (5th Cir. 1984). Petitioner's explanation that the issuance of the new notes with the increased interest rate was to compensate the shareholders for the non-payment of interest in 1979 is not supported by any evidence other than petitioner's own self-serving statements. Furthermore, although only the taxable year ending June 30, 1980 is before us, the fact that no payments were made in any future taxable year establishes a pattern which tends to negate petitioner's explanation. Moreover, in light of the fact that petitioner entered into an additional $392,941 of short-term loans with certain shareholders and outside third parties (the bulk of the loans being from shareholders, *257 see p. 6, supra) from 1978 to 1983 and paid every interest payment when due on these notes (not to mention $282,441 of the principal), we can draw no other conclusion except that the shareholders did not consider the notes at issue herein to be bona fide debt instruments [8] and had no expectation of receiving interest that accrued thereon. The next factor is to the use to which the funds represented by the notes were put. Petitioner concedes that the funds were used to pay for construction costs and initial working capital, i.e., "funds to start the corporate life." See Rowan v. United States,219 F.2d 51, 55 (5th Cir. 1955). Such use of funds has often been viewed by the courts as *258 permitting an inference that they represent risk capital and not debt. Texas Farm Bureau v. United States,supra at 314; Schnitzer v. Commissioner,13 T.C. 43, 61 (1949), affd. 183 F.2d 70 (9th Cir. 1950). Finally, we examine petitioner's debt to equity ratio. "Undoubtedly, the debt-equity ratio resulting from a transaction is of great importance in determining whether an ambiguous instrument is a debt or an equity interest." Kraft Foods Co. v. Commissioner,232 F.2d at 127. Unfortunately, despite numerous decisions which have discussed this issue, no clear cut set of standards or agreed-upon mathematical formula has arisen to determine whether or not a corporation is thinly capitalized for Federal income tax purposes. Rather, the courts have looked to the specific facts and circumstances in each particular case in making such a determination. While, on the one hand, we cannot say that the facts herein show evidence of an extreme situation which would argue against petitioner's position, such as a nominal stock *259 investment and an obviously excessive debt structure, see John Kelley Co. v. Commissioner,326 U.S. at 526, it is also not apparent from the record that the ratio was so low as to justify in and of itself a finding that petitioner was adequately capitalized. See Kraft Foods Co. v. Commissioner,supra at 127. To the contrary, the ratios stipulated to by the parties as of June 30, 1979 (3.27:1 inside ratio, 5.18:1 outside ratio), by themselves, do not clearly dictate a finding that the note constituted debt or equity. Cf. Charter Wire, Inc. v. United States,309 F.2d at 880-881; Litton Business Systems, Inc. v. Commissioner,61 T.C. at 379. Moreover on July 1, 1978, when originally issued, the inside ratio appeals to have been 3.85:1 ($377.040 to $97,990) and the outside ratio appears to have been 8.13:1 ($420.000 plus $377,040 to $97,990). [9] Petitioner has offered us no additional evidence as to what acceptable ratios would be with respect to a start-up business in petitioner's industry, see P.M. Finance Corp. v. Commissioner,302 F.2d 786, 788 (3d Cir. 1962), affg. a Memorandum Opinion *260 of this Court. [10]
In view of the foregoing, and within the guidelines of the opinions of the Second Circuit Court of Appeals (see p. 11, supra) as augmented *261 by other decided cases, we hold that petitioner has failed to carry its burden of proof that the long-term promissory notes were bona fide debt instruments and that the monies given in exchange for such notes did not constitute contributions to petitioner's capital. Petitioner is thus not entitled to an interest deduction under section 163(a). Accordingly, Decision will be entered for the respondent.
Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all Rule references are to the Rules of Practice and Procedure of this Court.↩
2. Although the $1,750 price per share would indicate a total purchase price of $98,000, the parties have stipulated, and the financial statements and the balance sheet on petitioner's tax return list, such amount as $97,990. The $10 discrepancy is unexplained and has no affect on our decision herein.↩
3. There is some confusion in the record as to whether Carl Lehmann was in fact a shareholder as well as a noteholder. Although the parties did not stipulate that he was an owner of petitioner's stock at the time of petitioner's incorporation on March 2, 1978 (see pp. 2-3, supra↩), he was listed in the stipulation as a shareholder/noteholder on July 1, 1978, and as a shareholder/guarantor in 1979. Since it is entirely plausible that Mr. Lehmann could have acquired a stock interest in petitioner after incorporation but before the issuance of the notes or the signing of the guarantee agreement, and since petitioner has offered no evidence to refute such an assumption on our part, we conclude that Mr. Lehmann was a shareholder of petitioner at the time the notes were issued. We note, however, that our decision herein is not affected by this conclusion.
4. Although the parties have consistently used the figure of $377,040, the financial statements and the balance sheet on petitioner's tax return list the amount of such liabilities as $377,010; the $30 discrepancy is unexplained.↩
5. Pursuant to the Proposed Regulation, a corporation's outside ratio is the ratio of its liabilities (excluding trade accounts payable, accrued operating expenses and taxes, and other similar items) to its stockholders' equity. A corporation's inside ratio is determined in the same manner, but excludes liabilities to independent creditors.↩
6. We note that the final regulations, as first adopted, were only to apply to instruments created after April 30, 1981. Thus, even if they had not been withdrawn, the regulations would not have impacted upon our decision herein. Similarly, since the proposed regulations were not even published until March 24, 1980, petitioner cannot argue that it relied upon them at the time it was being initially capitalized. ↩
7. We recognize, that, because of the variations in the fact pattern in this case from those involved in the cases to which we shall point, we are not inexorably bound to reach a given result under the so-called Golsen doctrine. See Golsen v. Commissioner,54 T.C. 742, 756-758 (1970), affd. 445 F.2d 985↩ (10th Cir. 1971).
8. The record is devoid of any evidence to the prospect of petitioner's business at the time the notes were issued. Moreover, evidence of record shows that it is unlikely that the notes could have been paid without selling or distributing petitioner's fixed assets thereby terminating petitioner's business. Cf. In re Lane,742 F.2d 1311, 1317↩ (11th Cir. 1984).
9. In addition to the "loans" represented by the notes, one of the shareholders advanced $100,000 in July 1978 for a period specified by the parties as "short term." If this amount is included in petitioner's liabilities as of July 1, 1978, the ratios become even greater. ↩
10. Petitioner relies instead solely on the withdrawn regulations to support its contention that it was adequately capitalized. Although we have chosen not to rely on these regulations in our decision herein (see note 6, supra↩), we note for the record, that, contrary to petitioner's assertion on brief, petitioner would not have fallen within the safe harbor provided for by respondent under sec. 1.385-6(f)(3) of the withdrawn regulations. Sec. 1.385-6(f)(3) provided for a safe harbor where the corporation's outside ratio was less than or equal to 10:1, and the corporation's inside ratio was less than or equal to 3:1. Since the inside ratio stipulated to by the parties was 3.27:1, petitioner would have fallen outside respondent's safe harbor.