**FIRST M & F CORPORATION, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**No. EC88–190–S–D.**

United States District Court, N.D. Mississippi, E.D.

July 2, 1991.

---

Jack D. Warren, Butler, Snow, O'Mara, Stevens & Cannada, Jackson, Miss., for plaintiff.

Richard F. Mitchell, Atty., Tax Div., U.S. Dept. of Justice, Washington, D.C., for defendant.

OPINION

SENTER, Chief Judge.

## OPINION

This suit involves an attempt by the plaintiff to recover amounts which it has paid to the Internal Revenue Service after certain deductions it took for tax years 1982, 1983, and 1984 were disallowed. The case presents the classic debt/equity question. The case is presently before the court on cross-motions for summary judgment. The facts are largely undisputed.

## FACTS

First M & F Corporation (the company) is a bank holding company which was formed in 1979. The primary purpose for formation of the company was to purchase a controlling interest in Merchants & Farmer's Bank of Kosciusko, Mississippi (the bank). Shortly after its formation, the company achieved this purpose by purchasing roughly 87 percent of the outstanding common stock of the bank. This purchase was accomplished through three separate transactions. The first occurred on May 15, 1979, when the company engaged in a private exchange of stock with the bank's stockholders who were not residents of Mississippi. In this exchange, the company gave one share of its common stock for each share of bank common stock that it received. In addition, the company either gave $30 in debentures or assumed $30 per bank stock share of the stockholder's indebtedness associated with the share of bank stock. Next, in November, 1979, the company made a limited offering of its stock to the bank's stockholders who were Mississippi residents. As part of this exchange, the company proposed to, and eventually did, assume the indebtedness of certain of its promoters which was associated with the bank stock being transferred to the company by the promoters. Finally, an offer was made to the rest of the Mississippi stockholders as follows: for each share of bank stock transferred to the company, the company would give one share of its own common stock plus three $10 de-

bentures.[1] The offer was conditioned on eighty percent of the outstanding common stock of the bank being tendered for exchange. By the end of February, 1980, the company had acquired 86.7 percent of the bank's common stock.

The debentures were executed on December 30, 1979. Each had a fixed maturity date. The debentures were issued in units of three that would mature in successive years beginning on December 30, 1989.[2] The debentures bore a fixed rate of interest of 10 percent per annum. The debenture certificate provided that in the event of dissolution or liquidation of the company, the claims of the debenture holders to payment of the principal sum would be subordinated to the claims of general creditors of the company. However, the principal sum plus any accumulated interest would be paid in full before any distribution was made to holders of the company's common stock. Annual interest payments were to be made on December 30 of each year out of "available net operating income" of the company. The certificate also provided that interest was to be cumulative, i.e., if for any reason an interest payment was not made for any one year, it would not be lost to the debenture holder, but would be carried over to succeeding years and in all events had to be paid upon maturity of the debenture. There were certain restrictions on the transfer of the debentures. For at least the first nine months after issue, the debentures could only be transferred to Mississippi residents.[3] In addition, to be valid as against the company, any transfer of a debenture had to be registered on the company's books. Otherwise, the debentures were freely transferable. There was, for instance, no requirement that any transfer of the debentures had to be accompanied by the transfer of the share of company stock which had been issued along with the debentures.

As a result of these exchanges, the company acquired 158,044 shares of the bank's common stock; issued debentures with a total face amount of $4,466,700; and assumed acquisition indebtedness totalling $274,620. Although the book value of the bank's common stock was $35 per share, its market value, as reflected on the books of the company, was $60 per share.[4] On its balance sheet, the company recorded the market value of the bank's stock which it received in the exchange as an asset with total value of $9,482,640. The assumed acquisition indebtedness was paid out of funds loaned to the company by another bank. This note was, of course, recorded as a liability, along with the face amount of the debentures. The value of the holding company's own stock issued in the exchange was recorded as capital. The excess of the value of the bank's stock over the sum of the acquisition indebtedness assumed, the face amount of the debentures, and the par value of the company's stock was recorded as additional paid-in capital.

No sinking fund was ever established for repayment of the principal amount of the debentures. According to Scott Wiggins, who served both as treasurer of the company and as executive vice president of the bank, the decision not to establish a sinking fund was made in reliance on the advice of a bank examiner for the Federal Reserve System. After concluding an examination of the company's records, this examiner had advised that it would be better to leave funds in the bank to earn income than to place them in a sinking fund. The senior management officials of the company were

1. The book value of the bank's common stock was $35 per share. The company's common stock was assigned a par value of $5 per share. Thus the $30 debenture.

2. In other words, for each share of bank common stock the stockholder would receive three $10 debentures, one of which would mature in 1989, one in 1990, and one in 1991.

3. According to the company prospectus through which this exchange offer was made, this restriction was placed on transferability to allow the company to take advantage of the exemption for registration requirements afforded by section 3(a)(11) of the Securities Act of 1933.

4. The defendant agrees that this was a fair estimate of the fair market value of the bank stock at the time of the exchange in question.

also of the opinion that anticipated cash flow for the company would be sufficient to cover both the annual interest payments and the principal when the debentures matured. The Federal Reserve authorities were apparently of the same opinion. In the order approving the formation of the company, those authorities stated that "it appears that [the company] will be able to service and retire the debt within a twelve year period while maintaining a satisfactory capital position in its subsidiary bank."

The company paid the interest due on or before the due date. On its tax returns for the years 1982, 1983, and 1984,[5] the company claimed deductions for interest paid in relation to the debentures in the following amounts: $486,405; $490,032; and $491,304. These deductions were disallowed by the Internal Revenue Service, and a deficiency was assessed against the company. The company has paid the deficiency plus interest and seeks a refund of the amount paid.

## ANALYSIS

■ Section 163 of the Internal Revenue Code, 26 U.S.C. § 163(a) (1988), provides that as a general rule "[t]here shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The question presented by this case is whether the amounts paid by the company were interest on true indebtedness or were, in fact, dividends paid on an equity investment in the company. This question has been addressed in several cases, and the courts have developed a list of factors which are relevant to the issue in most cases.[6] Taking each of the factors separately, the court's analysis follows.

The first factor to be considered is the name given to the actual instruments by the parties to the instruments. In this case, the instruments were entitled "Registered Debenture Certificates."

■ The next question is whether the instruments bore a fixed maturity date. If there is a fixed date in the future when the holder of the instrument can demand payment of the principal amount of the debt, then that is evidence that supports a conclusion that the transaction in question was a loan rather than an advance of capital. The debentures issued by the company had fixed maturity dates.

■ The third factor normally considered is the source of payments made to the holders of the instruments. As noted above, no sinking fund for payment of the principal upon maturity of the debentures was ever established. The executive officers of the company admit that they were relying on the income of the company, the primary source of which was dividends paid by the bank, to pay both the interest and principal. "[I]f repayment is possible only out of corporate earnings, the transaction has the appearance of equity, but if repayment is not dependent on earnings, the transaction reflects a loan to the corporation." *Estate of Mixon v. United States,* 464 F.2d 394, 405 (5th Cir.1972). As noted by the Fifth Circuit, however, "[T]his factor is somewhat anomalous in view of the fact that the majority of bona fide loans are likewise repaid out of earnings." *Id.* at 405 n. 15. Although this factor appears to weigh in favor of a finding of an equity investment, the court is of the opinion that under the circumstances presented

**5.** It is not clear if these are the only years for which the company claimed an interest deduction or the only years for which the I.R.S. disallowed the deduction. Nevertheless, they are the only years at issue in this case.

**6.** How these factors combine to support a conclusion depends on the particular facts of each case. The various authorities read by this court indicate that not any one factor standing alone is dispositive. Indeed, these factors do not constitute a checklist in the sense that each of the factors must be considered in every case, nor is the list generally used an exclusive one. Any fact which is relevant to the determination of the debt/equity question may be considered by the court.

As will be evident, the court has attempted to resolve the debt/equity issue in a way governed by the facts before the court, the arguments of the parties (and in some instances, their concessions, for which the court is indebted), and a reasoned balancing of the equities. It should be pointed out that the number of factors addressed here exceeds those usually found in the reported cases.

in this case, the converse is true. Defendant maintains, without any supporting evidence, that there was no "source of income sufficient to pay off the indebtedness. . . ." The company refutes this with numerous affidavits to the contrary which show the stability, profitability, and growth of the bank. Accordingly, the company had recourse to a source of payment sufficient to service its debentures. *Cf. Berkowitz v. United States*, 411 F.2d 818, 821 (5th Cir. 1969) (where only source from which advances could be repaid was income produced from taxpayer's property, "[t]here was no showing that by the use of this income the principal could be paid off in a timely manner, or indeed in the foreseeable future").

■ Also important in the determination of the nature of this transaction for tax purposes is whether the holders of the instruments had a right to enforce payment of principal and interest. The government admits that the debenture holders had a right to sue for payment of the debentures when they matured, but points out that there was no right to sue to collect any one year's interest. However, as noted above, the interest was cumulative. It was not lost forever to the debenture holder if income was not sufficient in any one year to meet the interest obligation. At maturity, the debenture holders would have a right to sue for both principal and any accumulated interest. On the other hand, if there is not sufficient income in one year to justify payment of a dividend, the stockholder will never be paid that dividend and has no right to sue to collect it. Under the present facts, this factor weighs in favor of treating this as a debt relationship.

The fifth factor to be considered is whether a right to participate in management flowed from the acquisition of the instrument. The government admits that there was no legal right to control the holding company explicitly associated with the debentures. One share of holding company stock came along with each set of three debentures, but the debentures were transferable separate from the shares of stock and vice versa.

The status of the contributions in relationship to regular creditors is also of importance. As noted earlier, payment of the principal amount of the debt upon liquidation or dissolution of the company was subordinated to the claims of general creditors. On the other hand, there were to be no dividends paid on the company stock until a substantial portion of the debt evidenced by the debentures was retired. Additionally, upon liquidation or dissolution of the company, the debenture holders were to receive full payment of both principal and any accumulated interest before any distribution was made to holders of the company's stock.

> The fact that an obligation to repay principal is subordinate to claims of the other creditors does not, however, necessarily indicate that the purported debt is in reality an equity contribution, especially where the advance is given superior status to that of other equity contributions.

*Estate of Mixon*, 464 F.2d at 406.

Another factor of importance is the capital structure of the corporation. If the company is sorely undercapitalized, then any infusion of funds takes on the appearance of an equity contribution. In this case the government admits that "capitalization of the holding company, as such, has not appeared to be inadequate." One indicator of whether a corporation is adequately capitalized is the company's debt to equity ratio. After completion of the transaction in question, that ratio for the taxpayer was approximately 1 to 1. This, coupled with the government's admission, is not indicative of "thin" capitalization.

Another question that must be asked is whether there was an identity of interest between creditor and shareholder. In the instant case, approximately 20 percent of the owners of bank stock received no debentures, but instead, as acknowledged by the government, had certain indebtedness assumed by the plaintiff in lieu of receiving such debentures. Further, the fact that the debentures were freely transferrable without regard to the stock "substantially dispels the element of proportional con-

trol...." *Tomlinson v. 1661 Corporation,* 377 F.2d 291, 297 (5th Cir.1967).

The source of interest payments is also important to the determination of the debt/equity question. In this case, interest payments were expressly to be made out of available income. This is sometimes referred to by the courts as payment of interest only out of "dividend" money. However, here it must be noted that the taxpayer is a holding company. Its primary purpose for existing is to own stock in other companies. Its major, if not only, source of income is dividends paid on that stock. If this company had borrowed the money to finance its acquisition of the bank stock from another bank, the only source it would have had for payment of the interest on that loan would still have been its profits, which were derived primarily, if not exclusively, from the dividends its bank stock earned.

■ The ability of the corporation to obtain loans from outside sources is also to be considered.

> The purpose of this inquiry is obviously to test whether the shareholder contributors acted in the same manner toward their corporation as ordinary reasonable creditors would have acted.

> If no reasonable creditor would have loaned funds to the corporation at the time of the advance, an inference arises that a reasonable shareholder would likewise not so act.

*Estate of Mixon,* 464 F.2d at 410. The "loan" in this case was totally unsecured. In fact, much of the acquired bank stock was apparently pledged to secure loans taken out by the bank to finance the purchase of other banks. The rights of the debenture holders were also subordinated to the rights of the company's regular creditors. As plaintiff admits, it is at best highly unlikely that any regular lender would have loaned the company the nearly $5 million required to purchase the bank stock which the company acquired on the same terms as those specified in the debentures. However, defendant seems to agree with plaintiff's representation that a loan from outside sources "would have been unfeasible since the Bank's shareholders would have refused cash for their Bank stock due to the massive tax liability they would have incurred from a cash redemption of their stock." In such a situation, the Fifth Circuit has upheld a taxpayer's right to seek alternative financing from its shareholders. In *Tomlinson,* the taxpayer actually sought to obtain outside financing but found its cost to be prohibitive. *Tomlinson,* 377 F.2d at 300.· Finding that the shareholders' advances constituted debt, the Fifth Circuit stated:

> Inability to obtain outside financing is not the same as, and cannot be equated with, the ability to obtain outside financing but at a cost which to the businessman is economically unwise. That outsiders offer credit only on prohibitive terms does not transmute a stockholder loan into equity capital. The Code does not specify from what source needed investment funds must be derived. We cannot, by manipulation of tax law, preclude the parties from exercising sound business judgment in obtaining needed investment funds at the most favorable rate possible, whether it be a commercial loan, or more likely and as is the case here, a loan from private interested sources with sufficient faith in the success of the venture and their ultimate repayment to delete or minimize the "risk factor" in their rate of return.

*Id.* Under the instant circumstances, the court is of the opinion that the company was entitled to seek alternative debt financing from the bank shareholders.

Courts also consider whether the corporation repaid the loans on the due date. In this case, the due date never arrived. In November, 1986, the company exchanged additional authorized shares of its own stock for the outstanding debentures so that it could pay dividends on its stock. (The company's officers all declare that this exchange was not contemplated before 1985 and the government has presented no evidence to the contrary.)

The final factor to be considered is the intent of the parties. "There is little doubt ... that intent, *at least where the facts are*

*ambiguous,* is to be considered in adjudicating any debt versus equity question." *Estate of Mixon,* 464 F.2d at 407 (emphasis added). At first blush this factor may appear to prevent summary judgment since intent is usually a question of fact, *see Texas Farm Bureau v. United States,* 725 F.2d 307, 312 (5th Cir.) (citation omitted), *reh'g denied,* 732 F.2d 437 (1984), *cert. denied,* 469 U.S. 1106, 105 S.Ct. 778, 83 L.Ed.2d 773 (1985); however, reliance on intent "becomes necessary only when a court's analysis of other objective factors fails to provide clear signals." *Id.* The government argues that the company's intent in issuing the debentures is "substantially irrelevant" since all objective factors point to a conclusion that the subject transaction was an equity contribution. The court agrees with the initial premise although an opposite conclusion is reached.

Under all of the pertinent facts and circumstances, the relevant factors make appropriate a conclusion that the debentures evidenced debt and that the interest paid thereon was deductible.

An appropriate order shall issue.

### ORDER

Pursuant to an opinion filed contemporaneously herewith, it is ORDERED:

That defendant's motion for summary judgment is not well taken and is denied;

That plaintiff's motion for summary judgment is well taken and is granted;

That the deductions claimed by plaintiff are allowed, and defendant is directed to refund the amount of the deficiency paid, together with interest.

SO ORDERED.