HAROLD J. and DOLORES S. WESTIN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Westin v. Commissioner
Docket No. 9619-83.
United States Tax Court
T.C. Memo 1987-238; 1987 Tax Ct. Memo LEXIS 242; 53 T.C.M. (CCH) 797; T.C.M. (RIA) 87238; May 11, 1987. James W. Littlefield, for the petitioners. Genelle Forsberg, for the respondent. COHEN
MEMORANDUM FINDINGS OF FACT AND OPINION COHEN, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: Year
Deficiency
1974
$3,721.71
1975
4,314.11
1976
27,205.00
1977
32,042.92
The parties agree that petitioners *243 are liable for the deficiencies determined for 1974, 1975, and 1976 and that petitioners are liable for a deficiency in 1977 of $22,730.34, as determined by respondent in an alternative position in his notice of deficiency for 1977. The issue remaining for decision, which was raised by petitioners in an Amended Petition, is whether a corporation known as Harold J. Westin Constructors, Inc. (Constructors) incurred business debts to Harold J. Westin which became worthless in 1979 or 1980, entitling petitioners to a net operating loss carryback to 1976 and 1977. FINDINGS OF FACT Some of the facts have been stipulated. The facts set forth in the stipulation are incorporated in our findings by this reference. Petitioners Harold J. Westin (petitioner) and Dolores S. Westin filed joint Federal income tax returns on the cash basis for the years in issue, an amended return for 1976, and, in June 1978, an application for tentative refund for 1977. Petitioners also filed joint Federal income tax returns for 1980 and 1981. Petitioners resided in White Bear Lake, Minnesota, when their petition was filed. Petitioner, who holds degrees in civil engineering and law, and who is licensed *244 as a professional engineer in 12 states including Minnesota, was associated with the following businesses during 1974 through 1977: Petitioner's
Business
Percentage Interest
Harold J. Westin and
Associates, Inc. (Associates)
100%
Harold J. Westin Constructors,
Inc. (Constructors)
100%
American Structural
Consultants (Consultants)
50%
Interstate Yachts
Partnership
50%
At relevant times, Nilcon-Minnesota, Inc. (Nilcon-Minn) was owned as follows: Date
Petitioner
Constructors
Consultants
Other
6-30-74
92% 5.00%
3.00%
0%
6-30-75
0%
88.78%
2.85%
8.41%
6-30-76
0%
85.59%
2.70%
11.60%
6-30-77
0%
80.37%
2.53%
17.10%
Associates, incorporated in 1966, was organized for the purpose of offering architectural and engineering services in designing buildings. Constructors, incorporated in 1959, was organized for the purpose of bidding on and performing general construction work. Nilcon-Minn was organized in 1973 to produce a relatively new prestressed concrete structural and heating, ventilating and cooling system known as "Nilcon," a system originally developed in Sweden. For all years pertinent, *245 petitioner was president of Associates, president of Constructors, and chairman of the board of directors of Nilcon-Minn. On June 26, 1975, Associates elected treatment as a small business corporation under Subchapter S of the Internal Revenue Code. Constructors and Nilcon-Minn filed consolidated corporate tax returns for their fiscal years ended June 30, 1975, 1976, and 1977, and both entities maintained their records on the accrual method of accounting. In or about 1970, petitioner met with the chairman of the board of Nilcon Engineering, A.B. of Sweden (Nilcon-Sweden) to discuss Nilcon-Sweden's operation and its new patents that were licensed worldwide. For a fee, petitioner thereafter conducted a study to determine, among other things, if the Nilcon technology would satisfy United States building codes. As a result of the study, petitioner concluded that the Nilcon technology was far superior to systems presently implemented in the United States, that it would satisfy United States building codes, that its costs would be competitive in the existing markets, and that because architects might be skeptical of systems based on someone else's product, Nilcon-Sweden should solicit *246 a large United States company to set the lead in implementing systems designed pursuant to the Nilcon technology. The Nilcon technology produces a prestressed concrete roof, floor, or wall section (Nilcon element). A Nilcon element is 4-foot wide by 1-foot deep and as much as 60 feet in length; it is constructed by use of a unique vibration system that compresses the concrete mix more densely than other systems. Thus, where other types of concrete sections or elements maintain a strength of 4,000 to 6,000 pounds per square inch, the Nilcon element maintains a strength of up to 11,000 pounds per square inch. Initially, Nilcon-Sweden offered to sell the Nilcon technology to the Spancrete Corporation for $1 million down and $1 million per year royalty. When the Spancrete Corporation failed to accept or otherwise respond, Nilcon-Sweden approached petitioner. Petitioner refused terms similar to those proposed to the Spancrete Corporation, and, instead, agreed to a performance contract whereby petitioner would license and engage other companies to open Nilcon factories. Pursuant to the performance contract, petitioner's goal was to open two factories per year until there were ten. *247 The companies thereby solicited would pay a licensing fee of $40,000, $20,000 to Nilcon-Sweden and $20,000 to Nilcon-USA, a business established by petitioner to solicit licensees. [1] The licensees would also pay a royalty of 5 percent of the sales price of all Nilcon products sold, 2.5 percent to Nilcon-Sweden and 2.5 percent to Nilcon-USA. Nilcon-USA sold a license to Nilcon-Minn, sold a license to Nilcon-Arizona, and bought a third license in order to stay on the two per year schedule (although no one bought the license from Nilcon-USA). Nilcon-Minn issued a Private Placement Memorandum (offering), dated May 7, 1974, providing pertinent information on Nilcon-Minn to prospective investors. A total of 92 units were offered at a cost of $20,000 per unit. Each unit included 125 shares of common stock for $7,500 and debenture *248 notes, at 12 percent interest, for $12,500. The indebtedness to the Debenture Noteholders would be subordinate to company debts to banks, trust companies, insurance companies, or other financial institutions. As described in the offering, the total cost of the plant and equipment, excluding the license, would be $2,210,000. Because Nilcon-Minn was in its organizational stages and unable to otherwise obtain credit, petitioner and Constructors were required to finance certain purchases. Assuming all investment units were sold, the proceeds would be used to reimburse petitioner, Constructors, and other parties for the following expenditures: Petitioner
$ 40,000
License fee
66,000
Machinery and equipment
$106,000
Constructors
$ 52,000
Services to February 28, 1974
48,000
Services from March 1, 1974
140,000
Construction contract
181,000
Prefabricated building
181,000
Concrete plant and mixer
107,000
Cranes and equipment
74,000
Construction materials
$783,000
Other Parties
$ 40,000
Freight insurance, import duties
58,000
Machinery
49,000
Suppliers
111,000
Architectural work (Consultants)
$258,000
*249 Nilcon-Minn was thereupon organized with about five investors, including petitioner. A plant was built by Constructors in Coates, Minnesota. Although financing the construction and other expenditures was tentatively arranged pursuant to a letter from National Bank of St. Paul, the bank gave notice in 1974 that because of economic circumstances it could not furnish any financing. Thus, instead of owning the property, Nilcon-Minn arranged to lease the land and building from Constructors. Also, Nilcon-Sweden arranged to finance a portion of the purchase of equipment by lending $229,787.30 in July 1974. That debt was represented by 10 notes at $22,978.73 each. Constructors made one payment of $22,492.81 to Nilcon-Sweden and recorded the transaction as an increase to its account for loans receivable from petitioner. The Nilcon-Minn plant commenced production in June 1976. By 1978, half of the total plant business was Nilcon-related work. To maintain operations, funds were advanced to Nilcon-Minn by Constructors, by Associates, and by petitioner (indirectly through Constructors). By mid-1979, Nilcon-Minn was at 70 percent of break-even capacity. At the time, the company maintained *250 high accounts receivable and very low cash flow. Constructors had pledged all of its accounts receivable to the bank furnishing Nilcon-Minn with funds. When an insurance premium of $40,000 came due on June 30, 1979, operating funds were not available, and Nilcon-Minn was shut down. Nilcon-Minn's license was thereafter cancelled. On November 27, 1979, Constructors filed a petition for relief under Chapter 11 of the Bankruptcy Code. [2] Petitioner believed that the business could be operated successfully, and he commenced negotiations for the sale of Constructors. Meanwhile, Constructors remained in business. In 1980, Constructors had accounts receivables of $683,000 that were trust funds on construction projects, and it was operating with six employees, including petitioner, five of whom were paid a total of $2,300 per week. In October 1980, the bankruptcy petition was dismissed. In their 1974, 1975, and 1976 *251 consolidated tax returns, for taxable years ended June 30, 1975, 1976, and 1977, respectively, Constructors and Nilcon-Minn reported, in Consolidating Statements, the following amounts of gross profit and taxable income: Return
Item
Constructors
Nilcon-Minn
Consolidated
1974
Gross Profit
$282,300
$0    $283,300 Taxable Income
118,344
(56,438)
61,906 1975
Gross Profit
333,072
0    333,072 Taxable Income
191,434
(343,039)
(151,605)
1976
Gross Profit
1,002,707
(37,064)
965,643 Taxable Income
453,516
(697,122)
(243,606)
In their 1974 consolidated return, Constructors and Nilcon-Minn reported the following amounts of taxable income for taxable years prior to consolidation: Return
Constructors
Nilcon-Minn
1971
$19,295
1972
24,309
1973
47,000
$ (55,595)
1974
* (182,813)
In the 1974 return, Constructors reported a beginning balance of $56,162 for buildings and other fixed assets. In the 1974 through 1976 returns, Constructors reported the following purchases and additions to its fixed assets: Asset
1974 Return
1975 Return
1976 Return
Buildings
$201,719
$513,908
$141,600
Furniture &
7,621
34,369
9,526
Fixtures
Machinery &
774,896
450,484
137,286
Equipment
$984,236
$998,761
$288,412
*252 In the 1974 through 1976 returns, Constructors reported the following amounts of total liabilities and net worth: Year Ended
6/30/75
6/30/76
6/30/77
Liabilities
$1,306,684
$2,749,924
$2,526,046
Net Worth
226,351
392,108
878,026
In the 1974 through 1976 returns, Constructors and Nilcon-Minn reported the following amounts of "Loans from Stockholders": Return
Constructors
Nilcon-Minn
Eliminations
Consolidated
1974
$68,832
$0 $0
$68,832
1975
126,995
136,000
0
262,995
1976
249,601
437,473
60,354
626,720
Petitioner was the only stockholder of Constructors, which maintained a record of his advances in an account called "Constructors - Note Payable - Officer; Account #66" (Account 66). Account 66 bears an opening entry dated July 1, 1968, reflecting an advance of about $2,100. From then until December 31, 1972 or 1973, at which time the account was reduced to zero, the account was maintained at balances of approximately $10,000 to $25,000. From February 22, 1974, through June 30, 1979, Account 66 reflected the following entries and balances: Date
Debit
Credit
Balance
1974
Feb. 22
$20,964.17
$20,964.17
June 30
50,000.00
70,964.17
30
33,512.00
37,452.17
30
22,213.48
15,238.69
30
10,863.85
4,374.84
1975
Jan. 29
85,022.62
89,397.46
29
26,492.81
62,904.65
1976
June 30
13,652.17
76,556.82
30
7,000.00
83,556.82
30
50,494.22
134,051.04
June 30
55.66
133,995.38
Nov. 30
26,471.58
107,523.80
1977
Apr. 30
6,000.00
113,523.80
30
45,000.00
158,523.80
30
56,077.00
214,600.80
30
70,000.00
284,600.80
May 31
10,000.00
294,600.80
June 30
45,000.00
249,600.80
July 31
3,500.00
253,100.80
Sept. 8
5,000.00
258,100.80
Oct. 31
2,500.00
255,600.80
Nov. 30
500.00
255,100.80
Dec. 31
6,000.00
249,100.80
1978
Jan. 31
500.00
248,600.80
Feb. 28
1,500.00
247,100.80
Mar. 31
1,000.00
246,100.80
Apr. 30
1,700.00
244,400.80
May 31
25,725.00
270,125.80
June 30
3,280.00
266,845.80
July 11
36,599.56
303,445.36
16,760.67
286,684.69
300.00
360.00
286,744.69
19,961.98
266,728.71
7,000.00
259,782.71
29,056.77
288,839.48
8,000.00
296,839.48
94.24
296,933.72
1978
Sept. 14
7,000.00
303,933.72
Dec. 30
7,980.00
311,913.72
600.00
311,313.72
94.24
311,219.48
1979
June 30
9,378.14
301,841.34
33,702.44
335,543.78
4,172.25
339,716.03
*253 OPINION Petitioner contends that he made certain advances to Constructors from February 1974 through June 1979, that the advances were loans made in connection with petitioner's trade or business, and that the outstanding loans became wholly worthless in 1979. Specifically, petitioner alleges unrepaid loans in the amount of $242,197.99, itemized as follows: Date
Description
Amount
1/29/75
Advance
$ 58,529.81 6/30/76
Advance
57,494.22 4/30/77 through
Advances
248,814.25 6/30/79
1/30/76 through
Payments and/or
(122,640.29)
6/30/79
credits
$242,197.99 Petitioners argue that they are therefore entitled to carry back to the years in issue a net operating loss resulting from the business debts that became worthless in 1979. Thus, although petitioners no longer contest respondent's determinations attributable to the years in issue, they maintain that the deficiencies in tax for 1976 and 1977 should be reduced to reflect adjustments for the net operating loss carryback. Petitioners bear the burden of proving that the transactions were *254 bona fide loans. Rule 142(a), Tax Court Rules of Practice and Procedure.
Respondent argues that petitioners are not entitled to the claimed carryback because there were no outstanding advances at the end of 1979, and, if there were outstanding advances, they were capital contributions rather than loans. Section 166(a)[3] allows a deduction for debts that become worthless during the taxable year; business bad debts may give rise to a net operating loss carryback under section 172. The amounts claimed by petitioners are deductible only if the unrepaid advances are shown to be bona fide loans and not capital contributions. Section 166; section 1.166-1(c), Income Tax Regs.; Matter of Uneco, Inc. v. United States,532 F.2d 1204, 1207 (8th Cir. 1976). To determine whether advances to a corporation are loans or capital contributions requires consideration of the particular facts of the case. Matter of Uneco, Inc. v. United States,supra; *255 Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 493 (1980). Close scrutiny is necessary in situations such as here, where the presence of control offers "the opportunity to contrive a fictional debt." Matter of Uneco, Inc. v. United States,532 F.2d at 1207; Cuyuna Realty Co. v. United States,382 F.2d 298, 300-301 (Ct.Cl. 1967). Cf. Tomlinson v. 1661 Corp.,377 F.2d 291, 297 (5th Cir. 1967). Courts identify and consider a variety of criteria for determining whether a shareholder's advance is debt or equity. [4] See Dixie Dairies Corp. v. Commissioner,supra, and cases cited therein. The Court of Appeals for the Eighth Circuit, to which an appeal in this case would lie, has applied the following factors: (1) Whether the corporation was so grossly under-capitalized that the loans were in fact needed for capital purposes and were actually intended to *256 be risked capital rather than a loan. (2) Whether the purported loans were made in proportion to equity holdings. (3) Whether the repayment of the loan was predicated on the success of the venture. (4) Whether there was a fixed date for payment of the note and a reasonable expectation of payment by that date. (5) Whether the note was subordinated to other corporate debts. (6) Whether third parties would have made the loan under the same conditions. (7) Whether the claimed loan was secured by a mortgage or otherwise. (8) Whether a provision was made for a sinking fund to retire the loan. (9) Whether the person making the purported loan participated in the management of the corporation. (10) Whether the corporation had a large proportion of debt to equity. [Matter of Uneco, Inc. v. United States,532 F.2d at 1208.] In Dixie Dairies Corp. v. Commissioner,74 T.C. at 493-494, we described the various factors and their purpose *257 as follows: The identified factors are not equally significant, nor is any single factor determinative. Moreover, due to the myriad factual circumstances under which debt-equity questions can arise, all of the factors are not relevant to each case. The "real issue for tax purposes has long been held to be the extent to which the transaction complies with arm's length standards and normal business practice." "The various factors * * * are only aids in answering the ultimate question whether the investment, analyzed in terms of its economic reality, constitutes risk capital entirely subject to the fortunes of the corporate venture or represents a strict debtor-creditor relationship." As expressed by this Court, the ultimate question is "Was there a genuine intention to create a debt, with a reasonable expectation of repayment, and did that intention comport with the economic reality of creating a debtor-creditor relationship?" [Citations omitted.] We have considered the facts and circumstances of this case and conclude, for the following reasons, that petitioners have failed to meet their *258 burden of proving that the advances by petitioner were bona fide loans. Advances - Account 66 Balance
Respondent's agent, Norman Jones (Jones), a certified public accountant, examined the individual and corporate tax returns, Account 66, various ledgers, and other relevant books and records. The summary of his findings and conclusions was admitted into evidence as an expert report. Jones concluded that Account 66, which showed a final balance of $339,716.03, should be reduced by $317,977.95 to reflect a correct balance of $21,738.08. To reach this amount, Jones made several adjustments. First, Account 66 had been increased and decreased by interest accruals with a net increase of $95,129.99, and Account 66 had been increased by accrued compensation of $46,900.34. Jones reduced Account 66 by these amounts because they were never reported in income by petitioner. Instead, they were simply treated in Account 66 as additional advances by petitioner. Second, Jones determined that Account 66 had been erroneously increased by $10,200, and therefore he deducted that amount from the account's balance. In making this determination, Jones noted four credit entries in Account 66, *259 each referenced to page CR (cash receipts) 14 of the general ledger, increasing its balance by a total of $25,378.24 as follows: INCREASES TO ACCOUNT NO. 66
REFERENCED TO PAGE CR14
DATE
CR. AMOUNT
December 31, 1971
$11,100.00
December 31, 1971
1,578.24
January 31, 1972
2,500.00
March 31, 1972
10,200.00
Total Accruals
$25,378.24
On page CR-14, however, Jones discovered only the following recorded cash receipts referenced to Account 66: RECEIPTS FROM MR. WESTIN
RECORDED ON PAGE CR14
DATE
AMOUNT
December 1, 1971
$ 1,578.24
December 14, 1971
8,500,00
December 22, 1971
1,300.00
December 28, 1971
1,300.00
January 31, 1972
2,500.00
Total Receipts
$15,178.24
Third, Jones reduced the balance of Account 66 by $165,747.62 representing alleged loans "which [he determined] have not been supported by the books or other records of Mr. Westin." The following schedule itemizes the alleged loans identified by Jones: SUMMARY SCHEDULE OF UNSUPPORTED CLAIMED ITEMS
Date
Description
Amount
June 30, 1974
Municipal Bonds for Land
$ 50,000.00
January 29, 1975
Swedish Note Payment by Mr. Westin
85,022.62
September 8, 1977
Money Given to McNeil
5,000.00
May 31, 1978
Loan from Hillcrest
25,725.00
Total Unsupported Items:
$165,747.62
*260 Respondent argues, in addition, that any remaining outstanding balance (after Jones' adjustments) should be offset by the balances in Constructors' receivables account from petitioner and by the receivables account from Associates apparently assigned to petitioner. We have carefully examined Account 66, the related records, and Jones' expert report. We do not adopt the balance in Account 66 proposed by Jones, or any balance for that matter. We believe that an accurate determination of the account's balance is impossible because of the confusing and unreliable state of the company records, including Account 66. We are nevertheless persuaded by Jones' reasoning and, in particular, by petitioners' failure to contradict the contents of Jones' report by reference to evidence in the record or by other evidence. Advances - Character
In determining whether advances constitute debt or equity, we generally focus on the substance of a transaction and not its form. Gooding Amusement Co. v. Commissioner,23 T.C. 408, 418 (1954), affd. 236 F.2d 159 (6th Cir. 1956), *261 and cases cited therein. In many cases, a transaction's form, i.e., journal entries, documentation, and other types of record keeping, supports the taxpayer's position or allegation. Indeed, sound record keeping is indicative of business-like conduct. In such cases, a court must determine if underlying circumstances, i.e., the "substance," are consistent with the form so structured by the taxpayer. Ambassador Apartments, Inc. v. Commissioner,50 T.C. 236, 244 (1968), affd. 406 F.2d 288 (2d Cir. 1969); Gooding Amusement Co. v. Commissioner,supra.
In cases where the parties are related, such as petitioner and Constructors, certain formalities usually respected in arm's-length transactions are sometimes ignored. See Litton Business Systems, Inc. v. Commissioner,61 T.C. 367, 377-378 (1973). The absence of promissory notes and other such formalities is not determinative, and courts look to other factors and other evidence to decide if the substance of a transaction is as the taxpayer claims. In this case, petitioners *262 argue that the advances were cast in the form of loans and that the transactions were "intrinsically" clear upon their faces. We disagree. Petitioner testified that promissory notes were issued for the money advanced, that the notes were interest bearing, that the notes generally maintained a 2-year maturity, and that the notes were not subordinated to other general creditors. Constructors' treasurer, who was generally responsible for the company's record keeping, testified that he prepared and signed most of the notes to petitioner. Petitioners thus argue that "the intent of the parties was to create a debt, as is evidenced by the accounting entries and the issuance of promissory notes with fixed maturity dates and provisions for interest." Not one note, however, was produced. Moreover, petitioners made no attempt, at trial or in post-trial briefs, to explain the absence of the notes. The failure to produce the alleged documentation or to at least explain its absence weighs against petitioners. Cf. Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947). Without the notes, we are otherwise *263 unable to determine on this record whether there was an interest rate and if it was fixed, whether there was a fixed maturity date, and whether the parties complied with such terms by timely payments of interest and principal. Respondent argues that repayments, if and when made, were only made when Constructors was financially able and thus dependent on the fortunes of the business. See Dixie Dairies Corp. v. Commissioner,74 T.C. 476, 495 (1980). Although it is difficult to determine with any degree of certainty that the fortunes of the business indeed controlled repayment, petitioners have not shown, nor have we found, otherwise. Inability to obtain debt financing on similar terms from an independent creditor is an indication that advances are capital in nature. Matter of Uneco v. Commissioner,532 F.2d 1204, 1210 (8th Cir. 1976); Gilbert v. Commissioner,248 F.2d 399, 406 (2d Cir. 1957). The record in this case clearly identifies a Nilcon-Minn problem with obtaining outside financing. Because Nilcon-Minn could not obtain outside *264 financing for constructing its plant and for other start-up expenditures, it relied on petitioner, Constructors, and Associates for necessary funds. The only evidence that Constructors incurred outside financing during the years in issue is an $801,000 loan by ITT Industrial Credit Company in November 1976. This note, however, was secured by the equipment of both Constructors and Associates and was guaranteed by petitioner and by Associates. Respondent argues that Constructors could not obtain financing without the personal guarantee of its owner, petitioner. Respondent also argues that Constructors could not obtain independent financing on "similar terms" to those on which petitioner advanced money because petitioner's advances were not secured and therefore subordinated to other creditors. Cf. Fischer v. United States,441 F. Supp. 32, 38-39 (E.D. Pa. 1977), affd. in an unpublished opinion 582 F.2d 1274 (3d Cir. 1978). We agree that Constructors would have difficulty obtaining independent financing on terms similar to those regarding the advances by petitioner. Petitioner admits that no security agreements or mortgages were executed on behalf *265 of the advances, and we doubt that any independent creditor would allow "payments of interest" in the form of irregular bookkeeping entries, as in Account 66, instead of cash disbursements. Also, because it appears that the only outside financing that Constructors obtained during the years in issue required petitioner's personal guarantee, his interests were thus subordinated. See Matter of Uneco, Inc. v. Commissioner,532 F.2d at 1210. Another indicia of capital contribution is that a corporation was so thinly capitalized that the loans were needed for capital purposes. Matter of Uneco, Inc. v. Commissioner,532 F.2d at 1210; Astleford v. Commissioner,516 F.2d 1394 (8th Cir. 1975), affg. a Memorandum Opinion of this Court. Despite the lack of an established formula for determining if a corporation is thinly capitalized, courts often examine the debt to equity ratio. Constructors' debt to equity ratios for its years ended June 30, 1975, 1976, and 1977, were 5.77/1, 7/1, and 2.88/1, respectively. In John Kelly Co. v. Commissioner,326 U.S. 521, 526 (1946), *266 where the debt to equity ratio was 4/1, the Supreme Court was satisfied that "material amounts of capital were invested in stock * * * [and thus did] not consider the effect of extreme situations such as nominal stock investments and an obviously excessive debt structure." See also Ruspyn v. Commissioner,18 T.C. 769, 778 (1952). In this case, the debt to equity ratios were not so extreme as would singly convince us that Constructors was thinly capitalized. We are persuaded, however, by the apparent use to which most of the advances were put, i.e., the purchase of equipment and other assets for use by Nilcon-Minn, a new business with considerable market risks because of its new and relatively unknown technology. Because petitioner was the sole shareholder of Constructors, we are not swayed by certain factors such as whether the purported loans were made in proportion to equity holdings and whether the purported lender participated in management. These factors almost always weigh against a sole shareholder and are thus more relevant to cases involving multiple shareholders. *267 See J.S. Biritz Construction Co. v. Commissioner,387 F.2d 451, 457-458 (8th Cir. 1967), revg. a Memorandum Opinion of this Court. Other factors, however, that do contribute to our decision are that the advances were, as petitioners admit, unsecured, and there was no evidence of a sinking fund to retire the alleged loans. See generally Matter of Uneco, Inc. v. Commissioner,532 F.2d at 1208-1210. In weighing the other evidence in this case, we have considered the belatedness of petitioner's claim that the "debts" were worthless. No bad debt deduction was claimed (1) on either of the 1979 or 1980 returns, although it was those years in which petitioner now claims that the debts became worthless, or (2) in the petition filed in 1983. In fact, the issue was not raised until about 3 weeks before the scheduled trial in March 1985, which was continued, and after a settlement had been reached regarding the deficiencies due for 1974 through 1977. Such facts suggest that petitioner's claim was essentially an afterthought. Cf. Commissioner v. Transport Manufacturing & Equipment Co.,478 F.2d 731, 737 (8th Cir. 1973), affg. 56 T.C. 388 (1971) *268 and 57 T.C. 469 (1971). For the foregoing reasons, we conclude that the advances by petitioner were placed at the "risk of the business" and were therefore capital contributions. Because of our determination, we need not address other arguments on whether the "debts" were business or nonbusiness or whether the "debts" became worthless in 1979 or 1980. Decision will be entered for the respondent.
Footnotes
1. The evidence is conflicting as to whether or not Nilcon-USA is a corporation. The agreement whereby Nilcon-USA grants Nilcon-Minn a Nilcon license identifies Nilcon-USA as a Minnesota corporation, but other documents in evidence make reference to petitioner d/b/a Nilcon-USA. Determination of Nilcon-USA's true character is not necessary in this case.↩
2. A petition for relief under Chapter 11 proposes an arrangement or plan for settlement, satisfaction, or extension of time to pay unsecured debts; it generally does not seek an adjudication in bankruptcy. See 8 Collier on Bankruptcy, par. 4.01↩ (14th ed. 1978).
*. Year ended February 28, 1975↩
3. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue.↩
4. Section 385 authorizes the Secretary of the Treasury to prescribe regulations for determining whether an interest in a corporation is stock or indebtedness. Final regulations have not been issued.↩